Huston, J.
This case brings into the consideration of the court, a species of property, relating to which, we have not many decisions. Fisheries for shad and herring have, however, existed from a very early period; and though we have no act of Assembly expressly creating the right, yet we have acts regulating, and in some respects, restraining it, of an early date. All those acts relating to *132 fisheries, seem to apply to fisheries for taking shad; or in the Delaware, perhaps, shad and herring. Ip fact, 1 do not know that the term fishery, either in any act of Assembly, or in common parlance in this state, is applied to any thing else than to a place where a seine or net is drawn, to take shad or herring; or to a right to fish with a net or seine in a particular part of a river, to take those fish; though, perhaps, those who have the exclusive right to a certain fishery, to take those fish, may also have the same kind of right to fish in the same place at all seasons, with a net, for any kind of fish; but I have not heard of any contest as to this matter. The right in question, arises under a will dated in 1748, and in 1752 was recognised in the Orphans’ Court, on a petition to divide the real estate of Sanderlin, the devisee; a well known kind of right, which being incapable of division, was allotted to one of five heirs, in fee, subject to a payment of an annual sum to each of the others; and by conveyance or descent, became again the sole property of the plaintiff.
Instead of going into the black letter books, to learn what was a fishery, and a free fishery, and a several fishery, I shall first examine our own acts of Assembly, and see what they have considered it and regulated it; for those regulations may show and may determine its nature; and if so, I am disposed to regard them, even though differing from old opinions in old feudal times. Many acts on many subjects were passed and in force for a time, which being re-enacted in a larger and fuller form, the prior acts became obsolete, and, are not easily found, and in some instances not worth looking for. That fisheries were important in early times, is among other things proved by an act in 1761, (1 Smith’s Laws, 231,) which in its preamble recites that large quantities of fry or brood of fish, and young fish are destroyed by dams, wiers, baskets, &c. &c. in the Delaware, Schuylkill, and Susquehanna, whereby the great quantities-of fish which were formerly to be taken in said rivers, are greatly diminished ; and then prescribes severe penalties against such as violate its provisions.
In 1771, (1 Sm. L. 314,) we find an act to regulate the fishery in the river Schuylkill. The first section relates to the practice which had grown up, of drawing several seines or nets in the same pool or fishing place, and prohibits it. The second section defines a pool; “ so much of said river as extends from one side or bank, to the other side or bank thereof; and from the place where seines or nets have been usually thrown in, to the place where they have been usuálly taken out, shall be deemed and held, and is hereby declared to be, a pool or fishing place.” It is hardly necessary to remark, that it is so much of the river, &c. which is the fishing place, and not so much of the lank, as was contended in this case.
So far nothing is said about the owner; but in the third section it is provided, that when two or more persons residing opposite to each other, near the said river, on different sides thereof, may have *133 suitable landing places on their respective shores, or on an island opposite thereto, for taking seines or nets out of the pool or fishing place; it shall be lawful for such persons to fish with their seines or nets alternately, and not otherwise; and the act then proceeds to define how this shall be done. This clearly points to the persons who have a suitable landing place on the shore, or on an island, as those who have a right to fish. This act was to be in force five years, and was continued in 1776; and in 1785, (2 Sm. L. 308,) a more full and particular act is found. The 4th and 5th sections are transcripts of the 1st and 2d above. The 6th section provides that “ where two or more persons hold or occupy lands on the same side of the river, adjoining to any pool or fishing place, nothing herein contained shall be construed to prevent or deprive any such person's from enjoying th e privilege of fishing in that part of the river, directly opposite their own land respectively, as a separate pool ox fishing place; the position of which pool is to be by continuing the course of the division line or lines of the persons next adjacent; and every such division to be subject to the same rules and regulations as 'other pools and fishing places are by this act subject.” This act contains several other provisions; and fixes periods at which they shall cease to fish for shad below the Falls, and ’other places. In this act we find the phrase fishing for shad, first mentioned; and a day of the year when they shall cease to fish for shad.
Here, also, we first find the words “ privilege of fishing in that part of the river, directly opposite their own land respectively, as a separate pool or fishing place,” and not as giving that right, but “ nothing in this act shall prevent or deprive any person of that privilege;” recognising such rights as then existing, and declaring that it was not meant to impair it. Many other acts were passed for preserving the fish and regulating fisheries in the Schuylkill. The precise nature and extent of the rights of Pennsylvania and New Jersey over the river Delaware, were not settled until 1783; and probably for this reason, we find no act regulating fisheries in the Delaware prior to that period; though the first act cited, was to preserve the fish in that and other rivers, and the preamble stated that they were not caught in such quantities as formerly.
In (4 Dali. Acts of Assembly, 143,) we find the agreement between the commissioners of the two states, dated 26th April, 1783, ratified 20th September, 1783.
The first section of that instrument is thus — “ It is declared that the river Delaware, from the station point, or north-west corner of New Jersey, northerly; to the place on the said river where the insular boundary of the state of Delaware toucheth the same, in the whole length or breadth thereof, is, and shall continue to be and remain a common highway, equally free and open to the use, benefit, and advantage of the said contracting parties. Provided nevertheless, that each of the legislatures of the said states shall hold and *134 exercise the right of regulating and guarding the fisheries on the said river Delaware, annexed to their respective shores, in such manner that the said fisheries may not be unnecessarily interrupted, during the season of catching shad, by vessels riding at anchor on the-fishing ground, or by persons fishing under a claim of a common right on said river.”
On the 30th of March, 1784, (1 Dall. Acts, 195,) we find an act to regulate fisheries in the rivers Delaware and Lehigh. The 2d section prevents, under a penalty, more than one seine being drawn in the same pool. The 3d section enacts, that “ within so much of the river Delaware as extends from the north-west corner of New Jersey, to the place on said river, where the insular boundary oí said river touches the same, and within all the islands belonging to this state, from the place where a seine has been usually or shall be usually thrown in, to the place' where it has usually been, or shall be usually taken,out, shall be, and hereby is declared to be, a pool or fishing placeand also contains many other regulations of the right of fishing.
On the 7th of April, 1786, (1 Dall. Acts, 446,) we have a supplement to this act, allowing to fish with two seines in one pool from the Falls at Trenton, to the line of Delaware state, and limiting the periods of fishing.
On the 6th of March, 1793, (3 Sm. L. 93,) was passed, an act for the sale of islands in the Delaware, Susquehanna, and other navigable streams. They were to be appraised, in order to ascertain their value, having regard to the wood, distance from the main land, and to the advantages which may be derived from the same in regard to fisheries.
In 1804, (4 Sm. L. 118,) we find another law, re-enacting and modifying the provisions of the act of 1784; it again describes a pool or fishing place; and in the 4th section directs that “ wherever any fishery is occupied upon the river Delaware, within the limits aforesaid, (that is, as far as it has been declared a highway) either the land-holder, tenant in possession, or some respectable person appointed by the fishing company, shall give bond to satisfy and pay any fines, for disobeying the provisions of the law at his or their respective fishery; and also file with the prothonotary a description of his or their fishing place, and of the township in which it is situated.” In this act we find, as before, in the agreement with New Jersey, the word fishery used; it also supposes a fishery may be owned by a fishing company; and the owner or occupier of the shore, or some person for that company, must give bond to the prothonotary. This act .proposes a joint law with Jersey.
On the 26th November, 1808, such an act was passed in Jersey; and on the 23d of February, 1809, (5 Sm. L. 5, and following pages) it is recited and re-enacted in this state. This act contains the substance of all the former acts, and some additions in direction and *135 penalties, and in section 10 provides, “That if any person or persons whatever shall cast or lay out any seine or net into the river Delaware, within the jurisdiction of this state, beyond the right angle of the shore and where his line strikes the river at low water mark going out, or suffer it to swing beyond the right angle of the shore of the river, and where his line strikes it at the water mark coming in, (except by unavoidable accident) every such person shall forfeit and pay, on being legally convicted thereof, the sum of twenty-five dollars for each offence, and costs to be paid to the person, against whose land such offence shall be committed;” and after reciting that part of the agreement between the two states, before copied, it proceeds in the 11th section to provide, “ That if any ship, vessel, or raft shall, during the season of catching shad in the Delaware, come to anchor at the same on any fishing ground, where shad are usually taken, and shall not immediately be removed from the said fishing ground, if such removal can be done with safety, on application for that purpose by the owner of occupier of said fishery, to the captain, pilot, or person having command of the said ship, vessel, or raft; or if any such vessel or raft be wilfully run on shore on any such fishing ground, then such captain, pilot, or person having the command as aforesaid, shall forfeit and pay sixty dollars to be recovered with costs by the said owner or occupier.
In the seventh volume of Pennsylvania Laws, 295, 296,- we find another law of New Jersey, re-enacted in this state, defining and limiting the right ,of fishing on islands and sand bars in the Delaware, to be within lines drawn from the upper and lower points of said island, at right angles, to a base line from the upper to the lower point of said island; and permitting the net tó swing below the lower line only, where there is no fishery below and adjoining.
■ Before proceeding to draw conclusions as to the nature and extent of the right of fishing with a seine in the Delaware, it will be proper to notice two cases in our own reports; (Carson v. Blazer, and Shrunk v. The Schuylkill Navigation Company,) and it will strike every one that there are several laws, and different provisions in those laws, as regards different rivers. When Carson v. Blazer, was tried before the Circuit Court, no law to regulate fisheries in the Susquehanna had been enacted. Several will be found since; the provisions in which have made the law in that river very different from the positions decided in that case; and evidently, the enactments to the Schuylkill and Delaware were not considered as applicable to that case, for they were not adverted to.
The case of Shrunk v. The Schuylkill Navigation Company, decided a matter totally different from the point trying in the case before us. When the Delaware was declared a navigable stream and public highway, from the southern to the northern line of the state, such declaration gave certain rights and privileges to all persons *136 passing in ships, boats, or rafts; and left in the state the power to regulate such navigation, and to improve such navigation in any way, which should seem to the government of the state, to be for the interest of the state. Several laws had been enacted, forbidding, under severe penalties, a.ny individuals from erecting dams, wiers, &c. within the bed of the Schuylkill, which would injure the navigation or the passage of fish. At length a law was passed to improve the navigation, and to render the water of that stream of general and permanent utility; but this was alleged as an injury to Shrunk’s fishery. The decision was that the state had, though no unauthorized individual had, a right to improve the navigation and render it a public advantage and benefit, even though some of the privileges and conveniences of those on its banks were impaired. The present is a different question; it is one between two citizens, in which the primary object, free navigation by all, or what the state may do, to improve that navigation, is not in question.
The right of one person to draw a seine in a particular part of the Delaware, is not inconsistent with the right which every person has to navigate his vessel in the same part of the river, in the course of his business. I shall not go farther back than is necessary to ascertain the origin or nature of a right of fishing in the Delaware, and confine my remarks to a fishery in that river. This case shows that the people and the courts, recognised, without dispute, a right of fishery in 1745 and 1752; we may say it was well known a century back. The act of 1761 states, that owing to the destruction of young shad in fish baskets, &c. the quantity was greatly less than had been taken in former times.
All the laws regulating fisheries in the Delaware, as well as the agreement between Pennsylvania and'New Jersey, before cited, are predicated of the idea of separate fisheries existing; and the agreement expressly stipulates, that the states shall hold and exercise the right of regulating the fisheries in the river Delaware, annexed to their respective shores, in such manner that the fisheries shall not be unnecessarily interrupted during the season of catching shad, by vessels riding at anchor on the fishing ground, or by persons fishing under a claim of common right in said river. It is not easy to see how, after this solemn treaty between these two states, any person can allege that each fishery was not a separate fishery, and that any person had, or could have, a right to fish, under a claim of common right. Neither state could grant such common right to fish in any and every part of that river; neither where the tide flowed or did not flow. But if this was not explicit enough, the act passed by both states in 1808-9, removes all possibility of doubt. It expressly prohibits every person from throwing out a net above, or drawing it in, or even letting it swing below his own line on land. Fisheries, then, existed long ago; by grant or sufferance, I care not which. The state had a right to regulate *137 fisheries, and has regulated them and bound itself by treaty to regulate'them, and has complied with the treaty. No man can be interrupted in his fishery opposite his own land, with impunity; and he who does interrupt such fishery, is tried, convicted, and sentenced to pay a fine, and forfeits his seine or net. But further, this act recognises, that a fishery may belong to the owner of the shore opposite to it, or to some other person, or to a company, who are, by a respectable person, to give bond to conform to the law, and to pay all penal ties if they violate it. The plaintiff has shown such right of fishery; but still matters were disputed at the trial of the cause, and here also. And first, a fishery is- in the river, and is not the space between high and low water mark, though the use of that space may be necessary in the use of it, and may be included in the term fishery. The men employed in carrying the rope attached to one end of the seine, may walk on the space between high and low water mark; and on the same space may place logs, or boards, or stone, to make what is called a pound, into which to throw the fish when taken out of the net, and on that space do all that has been usual and is necessary to the use of a fishery; but the right to a fishery does not of itself imply a fee simple in such space, between high and low water opposite the fishery; nor does it lessen or impair the right of the owner of the land opposite, except so far as is necessary to the use of the privilege of the fishery. • The right of the owner of land opposite and adjoining a navigable river, down to the water’s edge, has been too often and solemnly decided to be questioned; though this right is not in all respects the same as to the main land abo.ve the bank; for in high tide, or high floods, a vessel or raft may sail over it, or fasten to the shore in a storm, or any case of necessity; but the owner has the right and sole right to quarry stones or take gravel above low water mark, and the sole right to use it and the river opposite as a fishery, unless the right of fishery has been separated from the land; in which case, the right of fishery gives the use of it so far as is necessary, and has been used in the fishery, and no farther. The owner of the land may still, even in the fishing season, drive his cattle over it to water, or do any other act which does not injure or impede the use of the fishery. But he must not, even out of fishery season, do any act which will injure or destroy the fishery. “ When,” the court say, “the devise to David Sanderlin, is of the fishing place, to him, his heirs and assigns for ever; when we consider that the testator had no sort of dominion over anything beyond low water mark, and that his fishing place, if he had one, must necessarily be. within that line, and a part of the land that would otherwise be included within John Taylor’s devise, it would be hazardous to say a fee simple did not pass to David Sanderlin, but merely an easement over the land of John Taylor. Christopher Taylor, owning and occupying land bounded bf the river Delaware, like all other owners.of *138 land on.our principal rivers, had no exclusive privilege or right to' fish below low water mark opposite to his bank: that right remained in the state, and unless restrained by its laws, was common to every person in the state; he could neither grant nor devise any thing except within low water mark,” &c. We think this was said without a due examination of the treaty with New Jersey, and the acts of Assembly cited. A pool, or fishing place — a fishery is in the river; rafts, boats, or vessels, are not to cast anchor in it; the seine or net is cast out in the river; it is drawn through the river; it swings in the river; and the owner of the shore has the right, and sole right, unless he has parted with. it, to fish with nets opposite his land; the owner below cannot come a foot above the right angle from dividing point; the owner above cannot even let his net swing below the line from the dividing point, and no person can come there and fish under a claim of common right. Originally, it was a privilege, or franchise appurtenant to the shore; but may be leased, sold, or devised to a person not owning the land on the shore ; and such lessee, devisee, or purchaser, has no other right to the adjacent land than is necessary to the full use of the fishery. The fee simple, and all other rights not inconsistent with the use of fishery, may remain in- the owner of the land adjoining the river, opposite to the fishery.
Clearly, for a direct interruption while actually fishing, trespass may lie; there may be acts injurious to the fishery, for which cafe may be the proper remedy. ' The case, as exhibited to us, does not show what was done by the defendant, what acts are complained of, and we can only say that for a direct interruption, trespass is a proper action.
Let it be distinctly understood that this opinion relates only to the right of citizens, to. interfere with a fishery. What right the state of Pennsylvania and New Jersey jointly have to change the channel of the river; to build dams in it; to draw off its waters, &c., _&c., even though this should affect fisheries, I have said nothing about.
Judgment reverséd, and a venire de novo awarded.