CLEMENT v. BURNS.

| | |
|---|---|
| 43 | 609 |
| 66 | 11 |
| 66 | 22 |
| 43 | 609 |
| o68 | 84 |
| 43 | 609 |
| 72 | 116 |

The selectmen of a town have jurisdiction to lay out a highway over land reclaimed from the sea or navigable river, by embankments or filling in, so as to raise it above high water mark.

To give such selectmen jurisdiction, there must be an application to them; and a vote of the town appointing them a committee to lay the road is not sufficient.

A description in the application as beginning at a monument described, "and thence southerly to Cochecho River to low water mark," is bad for uncertainty.

When the selectmen have jurisdiction to widen and straighten a highway, the court will not revise their decision increasing the width at a particular point, unless fraud be shown.

An irregularity in the award of damages which may be redressed on appeal can not be urged against the laying out, in a suit by the land-owner for an entry upon the land.

The owner of land upon navigable waters may maintain trespass *quare clausum fregit* for an entry upon the shore, unconnected with the right of navigation or fishery, and removing therefrom manure mixed with the soil between high and low water mark.

This case, by consent of the parties, was tried by the court, and the evidence and allegations of the parties being fully heard and considered, the court found that the defendant was guilty in manner and form as the plaintiff had declared against him, and assessed the plaintiff's damages at the sum of three hundred dollars; unless the facts shown by the defendant, as hereafter stated, or any of them, should, in the judgment of the whole court, constitute in law bar to the action; in which case the court found the defendant not guilty.

The declaration in several counts, charged that the defendant broke and entered the plaintiff's close, called Clement's wharf, in Dover, and laid there large quantities of mud, and suffered it to remain there a long time, &c.; that he broke and entered the same close, and cut down a fence there erected, and carried away and converted the materials; that he took and carried away certain posts and boards of the plaintiff; and certain manure and soil of the plaintiff, and converted them to his own use.

The defendant, with the general issue, filed a brief statement; that the place where, &c., was a public highway; and he laid the mud there for a short and reasonable time, in transporting the same along said highway; that the fence, &c., was erected across said highway, so that the defendant could not use the same, and he therefore cut down and removed so much thereof as was necessary, and removed the materials to a small and convenient distance, doing no unnecessary damage; that the place where, &c., is the property of the State; that there was a custom, &c., for all the inhabitants of Dover, to use the place where, &c., to load and unload mud, &c.; that the defendant and owners of his farm have a prescriptive right to use the place where, &c., to load and unload mud, &c.; that the fence obstructed the use of his said customary and prescriptive rights, and he therefore cut it down, &c.; that the plaintiff gave the defendant license to use this wharf, &c.

The facts of the case are that the place where the trespass is alleged, is a part of the shore of the navigable tide waters of Cochecho river, between high and low water mark, and a narrow strip of upland, adjoining between high water mark and the general line of the Gulf road, so called, the upland being owned in part by the plaintiff. On this narrow strip of land and the shore of the river, the plaintiff's father, under whom the plaintiff claims, and himself, about 1834, erected a low wharf, for landing mud, weeds, and grass, for manure. Before that time the place was called a landing, and afterward it was indifferently called a wharf or landing.

In 1821 a highway was laid out on the same side of the river, which has always been since used and is called the Gulf road. This road, at the place in question, came near to the bank of the river, and the selectmen, for the length of five rods, at this place, bounded the road by low water mark on the river, and thereby included the whole of the place where, &c., in this highway, if they had power to do so. Several objections were made to this laying out.

No petition, or order of notice, or hearing, or award, or payment of damages to the owner of this land, is shown by the record, or otherwise. The records were searched and nothing found on the subject.

The first record relating to the road is an article in the warrant for a town meeting, "To see what the town will do respecting the laying out of a road from W. Flagg's to the turnpike, now pending in the court of sessions." The town appointed a committee, and on their report "Voted, that the selectmen be a committee to lay out a road from Dover landing to Flagg's farm, provided the land through which the road may pass shall be given by the owners, or purchased by subscription."

The record of laying out begins, "Agreeably to a vote of the town, we, the subscribers, selectmen of Dover, and a committee," &c., "have laid out," &c. Damages ten dollars are allowed to the estate of Daniel Waldron, and then it is added, "We consider the remainder of said land raised in value by making said road."

Copies from the Dover records were offered to show the laying out in 1795, of a way to the river, over the land now owned by the plaintiff, and some evidence of the use of the land as a way before 1821; but it appeared that said way has not been used since 1821, and it has since been inclosed with the plaintiff's land. Reference was to be made to these copies on the argument.

In April, 1845, the selectmen, upon a petition praying "for a new highway, beginning at a hub by the side of the Gulf road, near Clement's store-house, thence southerly to the Cochecho river to low water mark," laid out a new highway, "beginning on the southerly line of the Gulf road, at W. B. Wiggins' land (which adjoined the place where, &c.), and extending westerly on the Gulf road six rods and twenty links (which comes near Clement's store-house), extending southerly to low water mark, the westerly side line bearing south 21° east, and the easterly side line the line of Wiggins' land." This description included the whole of the place where, &c. Damages were awarded to C. Clement, the plaintiff, ten dollars. To this record it is objected that no proper *termini* of the road are described in the petition; that selectmen have no authority to lay out a landing, and this is a mere landing; that the notice given to the plaintiff was insufficient. The notice commenced, "You are hereby notified," &c., but no name of any person addressed was inserted, and no damages were paid to him.

To these objections it is answered, that the plaintiff attended and objected to the laying out, but made no objection on any of these grounds, and so was the evidence; and that the damages were tendered to him. The evidence tended to show that the damages were in fact tendered to him by one of the selectmen, but no express authority was shown from the other selectmen to make the tender. It appeared that the subject was talked of at the board, and it was understood by them that the tender was to be made, but no one was designated to do it. At the hearing on this petition the plaintiff said he had never denied any body the right to use the landing.

In April, 1854, a petition, signed by the plaintiff, defendant, and others, was presented to the selectmen of Dover, praying that the public highway, from Portland street to the house of John Burns (the Gulf road), should be made wider and straighter. A hearing was

appointed, and notice given to the plaintiff and others, and at the day appointed a hearing was had at which the plaintiff attended, and the selectmen laid out numerous widenings and straightenings of the road (not here material), some of which were on the plaintiff's land, and among others one in these words, "from said last mentioned stake, the northerly side line of.said highway runs north 85° east, five rods seven links, to a willow tree, spotted, and between said last mentioned stake and said willow tree, the southerly side of said highway is the northerly bank of Cochecho river, extending from a point on the river bank bearing south 2° east from the last mentioned stake to a point on said river bank bearing south 2° east from said willow tree." This description included the whole of the place where, &c., unless the term "bank" is limited to the original and natural high water mark, in which case it included the place where the fence stood, but not that where the mud was laid. Damages were awarded among others to Charles Clement, the plaintiff, "fifty-eight dollars, exclusive of moving fence and wall." The fence here in question was not then erected.

The plaintiff objects that no damages have ever been paid to him for the place where, &c. The defendants allege that these damages were paid, and the evidence tends to prove that after the award, the selectmen negotiated with the plaintiff to remove his fence and wall; that the plaintiff claimed $150 for his damages, and pay for moving his fences, which the selectmen declined to pay; that after repeated conferences the plaintiff agreed to take $145, as the selectmen understood, for his damages and for moving his fences; but as he and a witness understood for his damages for the land taken to make the road three rods wide, and for moving his fences, excluding the wharf.

The plaintiff claimed this sum of the town treasurer, but it was not then paid for want of money in the treasury. The next year the plaintiff was himself town treasurer, and he drew a check on the bank, having the town funds, in his own favor for that sum, and he credited himself as treasurer on the books, "Paid Charles Clement for land for road, $145." At the same time he filed among the receipts of the town a writing as follows:

"Dover, December 1, 1854. For and in consideration of $145 paid by the selectmen of Dover, I hereby agree to the following terms: namely, to turn out land on the Gulf road against my land, beginning at John Trickey's land on the northerly side of said road, and running to George P. Folsom's land on the southerly side of said road to my land, thence on the northerly side of said road to the corner opposite to the house of John Burns, meaning to turn out land enough to make the road three rods wide and build the fence.

"May 27, 1854.   To my derrick, three days, at 6 s.,          $3.00
                                                              145.00
                                                          _____

          Received payment,                                  $148.00

August 4, 1855.                              CHARLES CLEMENT."

It did not appear that the selectmen had any knowledge of this payment or writing which were made before the acts alleged in the declaration. The plaintiff, as highway surveyor, had repaired the Gulf road before the laying out of 1845, and since the laying out of 1854.

It appeared that the mud in question belonged to the defendant, was brought up the river by him, and landed from a gondola upon the low wharf, and removed without unreasonable delay to the defendant's farm, to be used as manure.

It appeared that before the facts here in controversy occurred, the town of Dover was indicted for neglect to widen and straighten said road, according to the return of 1854. A fine was imposed, execution issued, and an agent appointed to expend the same, so that it was said he had his remedy for his damages by execution, and no tender was necessary.

By direction of the agent, the plaintiff's manure was scraped away and the passage cleared and made easier over the whole of the place where, &c., little being done toward the river.

The fence in question was erected between the roadway and the wharf above high water mark, and along the general line of the fences on the road. The defendant cut down the posts and tore off the boards of the fence so far as was necessary to enable him to go upon the wharf with his team, but did no other unnecessary damage.

It appeared that the plaintiff knew that the defendant had several times landed mud on the place where, &c., and hauled it away, and never objected to his doing so before the commencement of this suit, except by building the fence, after the defendant had landed his mud there and before he had hauled it all away. The defendant could not then haul away his mud without removing this fence, or removing posts set in the land owned in part by the plaintiff, which were not in the highway.

Several years since a store-house, erected on a wharf partly owned by the plaintiff, adjoining the place where, &c., was used as a slaughter-house, and a part of the low wharf was fenced in and used for a hog-pen, in which the plaintiff kept his hogs, and the manure they made was his. Two or three years before the alleged taking of the plaintiff's manure, the store-house ceased to be so used, and the hogs were removed, but not the manure. The manure alleged to be taken was a deposit lying at the end of the wharf, on flats in the river bed. The plaintiff claimed that it was chiefly manure carried down by the rains and tides from his hog-yard, while the defendant's evidence tended to prove that it was chiefly mud casually lost over into the dock in unloading his gondolas. It was probably derived from both sources, and mixed with the sand of the shore by the tides.

No custom or prescription, such as were alleged in the brief statement were proved.

*Wheeler & Hall,* for the plaintiff.

*Woodman,* for the defendant.

Bellows, J.* Assuming the wharf to have been raised above the ordinary high water mark, as from the case we infer it was, a highway might rightfully be laid over it, without raising the question of authority in the selectmen to lay a road over navigable waters. That part of the shore having been reclaimed by the erection of the wharf, the new land thus formed must be regarded, so far as the proprietor is concerned, as private property, and subject to the right of eminent domain, like the upland to which it is attached; *Henshaw* v. *Hunting*, 1 Gray 203 ; and the outer edge of such erection will, for most purposes, be regarded as the original bank of the stream. Ang. on Tide Waters 240 ; *Udal* v. *Trustees*, 19 Johns. 175 ; *Stryker* v. *Mayor of New-York*, 19 Johns. 179 ; *Dickinson* v. *Codman*, 1 Sandf. Ch. 214 ; *People* v. *Lambier*, 5 Den. 9.

The question then is, whether a highway has been legally laid out over the *locus in quo*. The laying out of 1821 was defective, because no application to the selectmen is shown, either written or verbal, and therefore it does not appear that they had any jurisdiction. *Pritchard* v. *Atkinson*, 3 N. H. 335 ; *Wiggin* v. *Exeter*, 13 N. H. 304 ; *Haywood* v. *Charlestown*, 34 N. H. 23. The vote of the town, appointing the selectmen a committee to lay out the road upon certain conditions, which are not shown to have been complied with, can not be regarded as an application within the meaning of the law. See *State* v. *Newmarket*, 20 N. H. 519 ; *State* v. *Rye*, 35 N. H. 368. Nor is there any evidence of user from which it might be found that application was duly made.

This conclusion makes it unnecessary to consider the other objections arising from the want of notice and assessment of damages, which might prove to be serious when made by the land-owner himself. *State* v. *Richmond*, 26 N. H. 232; *State* v. *Reed*, 38 N. H. 59–61.

The laying out of 1840 is objected to because of uncertainty in one of the *termini* in the application, which is the Cochecho river at low water mark ; with no designation of any point upon the river except what may be derived from a statement of the course from the other *terminus*: namely, "Southerly to the Cochecho river to low water mark." By an examination of the plan exhibited, the road actually laid out extended from the *terminus* begun at, south 21° east, something like three rods, with a width of six rods and twenty links, and extending to low water mark ; and it is quite apparent that a slight change of the course, such as to south 21° *west*, or even to *due* south, would have struck the river at a very different point.

Under these circumstances we think this laying out was invalid, because there was no sufficient description in the application.

It is well settled, in the cases already cited, that an application is essential ; to which may be added the case of *Cole* v. *Canaan*, 29 N. H. 88 ; and we think that a necessary ingredient is a description of the road prayed for with reasonable certainty. Here but one proper *terminus* is given ; and to hold that for the other the Cochecho river at some point which might be reached by a southerly course was sufficient, would be to introduce a looseness of practice that the law could not tolerate.

* Doe, J., having been of counsel, did not sit.

The selectmen, having no jurisdiction for the want of a valid petition, the objection was not waived by omitting to urge it at the hearing. *State* v. *Richmond,* before cited.

The laying out of 1854 must be regarded as valid. There is nothing in the case to show that the selectmen exceeded their jurisdiction, or laid out a new highway instead of widening and straightening the old one; and the court can not say that the addition to the width at this point, was not required for the legitimate purpose of improving the old highway. Of that the selectmen, like the road commissioners, were made the judges, and in the absence of any proof of fraud, the court would not, on *certiorari,* and much less in this proceeding, undertake to revise their judgment. *Hampstead's Petition,* 19 N. H. 349; *Hopkinton* v. *Winship,* 35 N. H. 209 ; *State* v. *Richmond,* 26 N. H. 232 ; *State* v. *Canterbury,* 28 N. H. 224. Nor do we think the plaintiff can avail himself in this suit of the irregularity pointed out in the award of damages. If the award was inadequate, a plain remedy is given by petition within one year after the road is opened; Comp. Stat., ch. 53, sec. 9 ; and we think this was the appropriate remedy in this case. It is true that there is reason to suppose that the assessment of damages did not include all the injuries to the plaintiff which should have been considered; but on the petition for redress, which is in the nature of an appeal, this error like others would be corrected. This irregularity, then, is not one that strikes at the jurisdiction of the selectmen, and can not therefore be reached in this way. *State* v. *Canterbury,* 28 N. H. 224 ; *Gorrill* v. *Whittier,* 3 N. H. 268. *Tucker's Petition,* 7 N. H. 405.

But it is urged that the damages awarded have never been paid, and that, therefore, the road has never been legally made or opened to the public, it being provided by law (Comp. Stat., ch. 56, sec. 1) that no highway shall be made until the damages awarded have been paid. But whether the plaintiff, in this proceeding, can urge this objection or not, it having been settled in *Tucker's Petition,* 27 N. H. 411, that it is not cause for *certiorari,* we are of the opinion that the evidence tends to show an actual payment. The case finds what must be regarded as the opening of the road by the agent appointed to expend the fine imposed, and the plaintiff having neglected to appeal from the assessment of damages within one year from such opening, the assessment must be taken to be final, conclusive, and binding upon the plaintiff. In May, 1854, after some arrangement between the plaintiff and the selectmen, by which it was agreed that he should receive a sum larger than was awarded, he, being the town treasurer, received of the town the sum so fixed upon, and has ever since retained it. It is true that in his receipt acknowledging the payment, he undertakes to exclude a portion of the land taken, being the *locus in quo;* but the selectmen do not appear to have assented to this limitation, nor had they any power to do so. And we are inclined to the opinion that when, on his neglect to appeal, the assessment became fixed and binding upon the plaintiff, there was evidence from which it might be found that the damages were paid out of the money received by him.

The next inquiry is as to the southern boundary of the highway which is described as the northerly bank of the Cochecho river; and we are of the opinion that the outer edge of the wharf must be regarded as the bank of the river, although extended by filling up beyond the original bank; and this view is sanctioned by the authorities before cited in Angell on Tide Waters 240–245. It is not like the case of land bounded by the river itself, in which case it extends to the thread, except in the case of navigable rivers; but when bounded upon the bank it does not go to the water. *Rix* v. *Johnson,* 5 N. H. 519; *Daniels* v. *Railroad,* 20 N. H. 85; *Hatch* v. *Dwight,* 17 Mass. 289; *Nickerson* v. *Crawford,* 16 Me. 245; 3 Kent Com. 430.

Upon these principles, the entry upon the wharf is justified; and the remaining question is, whether the plaintiff has such an interest in the shore of the river below the wharf, and between that and low water mark, that he can maintain trespass for an entry upon it and carrying away a quantity of manure washed off from his wharf, and mixed with the sand of the shore. By the principles of the common law, the title to navigable waters and the soil beneath, is vested in the crown in trust for the public; and a grant of land to a subject, bounded by such waters, will ordinarily extend only to high water mark. The King is held to be the conservator ● the public right of navigation and of fishery, and as incident thereto, may establish ports and other conveniences for commerce; but having once granted the bank to a subject, he has no power to grant to another the right to lade or unlade upon it; and since *magna charta,* although there is some conflict in the authorities, the better opinion now is that he can not grant the soil under navigable waters. *Martin* v. *Waddell,* 16 Pet. 410, and cases there cited; *Duke of Somersworth* v. *Fogwell,* 5 B. & Cr. 883; *Blundell* v. *Catterall,* 5 B. & A. 287, 294, 304, 309.

This dominion and propriety of the King over navigable waters and the soil under them, is part of the *jura regalia,* an incident of the royal authority, and associated with the powers of government as a high prerogative right; and yet, although, as we have seen, he can not in general divest himself by grant of the title to the soil beneath such navigable waters, this limitation does not extend in its full force to the soil between high and low water mark. Hale (*De Jure Maris,* ch. 4) says, "it is admitted that between high and low water mark, *primâ facie,* it (the soil) belongs to the King. Although it is true that such shore may be, and commonly is, parcel of the manor adjacent, and so may belong to a subject, as shall be shown, yet *primâ facie* it is the King's." See, also, *Blundell* v. *Catterall,* 5 B. & A. 268, before cited.

So by grants from the crown, the conservation of ports has been to a great extent committed to the corporations of the various cities. *Rex* v. *Russell,* 6 B. & C. 598. Act of Parliament, 20 Hen. 7, in respect to the river Thames, cited in Shulz on Aquatic Rights, 59, 24 Law. Lib. 22. As the necessary result of these principles and this state of things, the erection of wharfs and quays, for the convenience of navigation, was to a great extent, if not generally, caused by the owners of the banks, without whose consent it could

not be done at all, as they only had access to the water over their banks. Hale, *De Jure Maris* ; Ang. on Tide Waters.

In theory it was assumed that such erections were made by license from the crown, previous to the granting of which, as well as all other estates, it was the ancient usage to make inquisition by the writ *ad quod damnum*, and upon the return of the inquisition that such grant would work no injury to the King, or any other, the license was granted. Com. Dig., Tit. *Ad quod damnum*. However, as the King could not grant the right to erect a nuisance, the question of nuisance or no nuisance was still open, notwithstanding the license, and it has also been decided that such erection was not necessarily a nuisance, although no inquisition was had. *Rex* v. *Russell*, 6 B. & C. 598.

Whatever then may have been the theory in England, it would seem that, practically, the right to wharf out in front of his land was exercised by the riparian owner, taking care not to interfere injuriously with the interests of navigation.

As to this country, although our ancestors brought with them the substance of the common law, yet many of its refinements and technicalities, not suited to the simplicity of our condition, were left behind; and in a large number of the States a usage sprang up which at length acquired the force of law, and gave to the riparian owners upon navigable waters either the absolute title to the soil between high and low water mark, or the exclusive right to erect wharves, piers, and quays, and to reclaim from the sea the flats in front of their lands. In all cases, however, the right was held subject to the paramount interests of navigation, which were guarded with all the common law jealousy.

The principles out of which this usage sprang are common to both countries ; namely, the exclusive right of access to the water over his banks, enjoyed by the riparian owner; his title to the soil gained from the sea by imperceptible accretion or alluvion, by which he alone can have title to the flats which are reclaimed by gradual marine increment, or artificial deposits made without detriment to the public right of navigation, from which are necessarily deduced the doctrines that none but the riparian owner can erect such wharves and other conveniences for navigation, or reclaim the flats in front of his land; nor can the sovereign power itself authorize it to be done without his consent, except through the right of eminent domain. To the exercise of these rights of the riparian owner, from the earliest stages of the settlement of our country to the present time, is undoubtedly due the great facilities enjoyed by our commerce in the erection of wharves, docks, and other conveniences ; and it is easy to understand that the wants of navigation should give the most liberal interpretation to the rights of the riparian owner.

In most of the American States the exclusive right to occupy the soil of navigable waters between high and low water mark for such erections, and to reclaim it by filling up, so that the public right of navigation is not injured, has been recognized.

In New-Jersey the subject has been most ably and thoroughly

discussed, and the doctrine above stated · fully established. *Gough* v. *Bell,* 2 Zabriskie 441. In this case the plaintiff owned the upland, and while filling up the flats in front of great extent and value, or immediately after they were so filled up, the State granted the flats to another; but it was held that nothing passed by the grant. *Green,* C. J., says, that from a very early period such riparian owners have exercised the right of appropriating the shore in front of their lands to low water mark, for docks, wharves, and filling in and reclaiming the soil, upon the shores of the Hudson, Delaware, Raritan, Passaic, and Hackensack; and in many instances all traces of the original high water line are gone; and he says such is the local usage and common law of New-Jersey; and he also says that most of the Atlantic States had adopted the principle that extends the riparian owner to low water mark. The judgment in this case was afterward affirmed upon great consideration by the Supreme Court of Appeals, reported in 3 Zabri. 624, where it is said, that the right to wharf out and otherwise reclaim land has been universal, and never questioned until recently; and that it has been done without license from the sovereign power, there being no traces of the writ *ad quod damnum,* or any ·similar proceeding.

The same doctrine is recognized in Connecticut. *East-Haven* v. *Hemingway,* 7 Conn. 187; *Chapman* v. *Kimball,* 9 Conn. 38; *Nichols* v. *Lewis,* 15 Conn. 136. In this case it was held that ejectment would lie for flats in front of the plaintiff's upland, though filled up by the defendant. A similar doctrine is maintained in *Frink* v. *Lawrence,* 20 Conn. 117, where a bill in equity was brought and maintained to protect a wharf so erected.

In New-York, it is held that grants of land on navigable lakes extend only to the shore, but that the bed of the lake can be granted only to the owner of the upland; 3 Kent Com. 430. See, also, *Kingman* v. *Sparrow,* 12 Barb. 201; Ang. on Tide Waters 240; 19 Johns. 175, 179; *Champlain Railroad* v. *Valentine,* 19 Barb. 492; where it was held that the soil on Lake Champlain, between high and low water mark, belongs to the owner of the upland, who was bounded on the lake.

· In Pennsylvania, it is held that the rules of the common law do not apply to our great inland rivers, and that the riparian owners do not go to the thread of the stream; but that in the case of navigable waters, he goes to low water mark. *Hart* v. *Hill,* 1 Whart. 135; *Ball* v. *Slack,* 2 Whart. 539; *Chess* v. *Manown,* 3 Watts 219; *Bird* v. *Smith,* 8 Watts 434; *Cooper* v. *Smith,* 9 S. & R. 26; *Chambers* v. *Ferry,* 1 Yeates 167; *Shunk* v. *Schuylkill Co.,* 14 S. & R. 71; *Batlett* v. *Commonwealth,* 17 Penn. St. 206. *Lehigh Valley Railroad* v. *Trone,* 28 Penn. 206; *Frytag* v. *Powell,* 1 Whart. 536; Ang. on Tide Waters 235; 3 Kent Com. 430.

In Rhode-Island, the custom has been general, supposed to have originated in an early colonial statute of 1701, to make accessions by embanking in upon the water, so long as no injury was done to the public. Ang. on Tide Waters 236.

In Ohio, the Ohio river is put upon the footing of navigable

waters, but it is held that the riparian owner extends to low water mark; and Judge McLean holds, that "no supervening right over any part of the space can be exercised or maintained without the consent of the proprietor," and that such owner "has the right of fishing and of ferry, and of every other right which is properly appendant to the owner of the soil," and that the State can not divest him of any of these rights except by a constitutional exercise of the right of eminent domain. *Bowman's Devisees* v. *Waltham*, 2 McLean's C. C. 376, cited in Ang. on Tide Waters 172; *Blanchard* v. *Porter*, 11 Ohio 138.

So in Kentucky, *Thurman* v. *Morrison*, 14 B. Mon. 367; and in Missouri, *O'Fallen* v. *Daggett*, 4 Mis. 343. Such, also, is the doctrine in North-Carolina and Tennessee. 3 Kent Com. 431; *Wilson* v. *Forbes*, 2 Dev. 30; *Ingraham* v. *Theadgill*, 3 Dev. 59; *Ellder* v. *Barnes*, 6 Humph. 358; *Stuart* v. *Clark*, 2 Swan 9.

In Massachusetts and Maine it is now an established rule of property that the riparian owner extends to low water mark, if not over one hundred rods, subject only to the public right of navigation. It is not the result of positive law, but of long continued usage, which has become the common law of those States. The origin of this usage has been traced to an ordinance of the Colony of Massachusetts, passed in 1641, by which the ownership of uplands upon navigable waters was extended to low water mark, if not over one hundred rods. This, however, never applied to the Colony of Plymouth, and was soon annulled with the charter under which it was made; yet the usage continued, and became so universal as to ripen into a settled rule, in the construction of such grants, not only in the Colony of Massachusetts, but in that of Plymouth, as well as the District of Maine. *Storer* v. *Freeman*, 6 Mass. 438; *Ingraham* v. *Wilkinson*, 4 Pick. 268; *Barker* v. *Bates*, 13 Pick. 255; *City of Boston* v. *Lecraw*, 17 How. 420; *Lapish* v. *Bangor Bank*, 8 Greenl. 85; *Emerson* v. *Taylor*, 9 Greenl. 43; *Moore* v. *Griffin*, 22 Me. 350; Ang. on Tide Waters 226. It should be borne in mind, also, that by the charters under which these colonies were planted, there was vested in the grantees not only the Crown's title to the lands granted, but its rights and jurisdiction in and over the navigable waters and sea shores, to be held, as by the Crown, in trust for the public. *Barker* v. *Bates*, 13 Pick. 255; *Bell* v. *Gough*, 2 Zabr. 624; *Martin* v. *Waddell*, 16 Peters 367.

From this examination of the adjudged cases, it is quite apparent that the principles of the English law have been much modified in the American courts, and that it must now be conceded as an established rule of American law, that the owner of uplands adjacent to navigable waters has an interest in the shores, of which he can not be deprived, even by the sovereign power, without compensation (See 2 Am. Lead. Cases, 224); and the cases are numerous, among those cited, where, for infringing such rights, actions of various kinds, including actions of ejectment and trespass *quare clausum fregit*, have been maintained by the riparian owners, especially when the soil between high and low water mark has been reclaimed by the erection of wharves, or the filling up of flats. In

these cases it is held that the riparian owner has such a possession as to entitle him to maintain a suit against an individual disturbing that possession, without lawful authority from the sovereign power, which might doubtless be exerted to abate a nuisance to the navigation. If a writ of entry or trespass *quare clausum fregit* can be maintained for an entry upon the riparian owner, after the soil has been so reclaimed, or while in progress of being filled up, it is difficult to perceive any solid reason for withholding the appropriate remedy when a person enters upon and takes possession of such shore for the erection of wharves, or fishing huts, or of reclaiming the land from the sea, or for the purpose of quarrying rock, removing the soil, or any other purpose not connected with the public right of navigation, or fishery. If, in these cases, the riparian owner has no remedy, the result must be that his interest in the shore is of no value, because he may be deprived of the possession by any person who may choose to occupy it for any purpose whatever. But the law is held otherwise, and the rights of a riparian owner may be vindicated by suit, not only when the soil has been reclaimed from the sea, as in *Gough* v. *Bell*, 2 Zabr. 441, and *Nichols* v. *Lewis*, 15 Conn. 136, where ejectment was maintained by the owner of the upland for flats adjoining, upon which the defendant had entered and filled them up; but in cases where the soil has not been reclaimed, actions have been maintained, as in *Hart* v. *Hill*, 1 Whart. (Penn.) 137, where it was held that the owner of the upland has the sole right of quarrying stone between high and low water mark; and in *Lehigh Valley Railroad* v. *Trone*, 28 Penn. 206, where it was held that the title to a spring so situated was in the riparian owner; so in *Evans* v. *Trumbull*, 2 Johns. 322, it was held that sea-weed cast upon the shore was such a marine increase as belonged to the riparian owner, and he might justify a resistance to its removal. In *Barton* v. *Bates*, 13 Pick. 355, trespass *quare clausum* was held to lie, by the riparian owner, for an entry upon the shore to carry off a wreck cast thereon. See, also, *Thurman* v. *Morrison*, 14 B. Mon. 367; *Blanchard* v. *Porter*, 11 Ohio 138; *Frink* v. *Lawrence*, 20 Conn. 117; *Chapman* v. *Kimball*, 7 Conn. 41. To deny the right to maintain a suit for an entry and removal of sand and manure as in the case before us, must be upon a principle that would apply equally to an entry to quarry stone, fill up flats, erect buildings or wharves, and would be wholly inconsistent with any interest in the riparian owner in the shore, either for access to the water, erecting wharves or slips, reclaiming flats, or any purpose whatever. The withholding of a remedy in cases of this sort, could only be justified upon the ground that the title to the shore of navigable waters is exclusively in the sovereign—a doctrine which we think has never been received, in its full force, in the American courts—and we can see no practical inconvenience in following the authorities which, overlooking nice technicalities, give to the riparian owner appropriate remedies for any invasion of his rights. Such have been extensively adopted in this country, both in respect to navigable waters and our large inland lakes and rivers, and so far as we can learn, without any practical evil; and, judging from the recent case

of *Blundell* v. *Catterall*, 5 B. & A. 268, where the riparian owner, to whom, as lord of the manor, the shore belonged, was allowed to maintain trespass *quare clausum fregit* against a person entering on the shore to bathe, there is a tendency in the English courts in the same direction.

As a rule of positive law, the ordinance of 1641 was not binding upon New-Hampshire; but when we consider that a union was effected in that same year between New-Hampshire, or so much of it as was then settled, and Massachusetts, which was continued for about forty years, making them practically one government, we should naturally expect that the same usages would spring up here under that ordinance, especially as such was actually the case as to one shore of the Piscataqua river, which then, as now, afforded the principal part of the navigable waters of this State. That a similar usage did spring up, and has always existed, giving to the riparian owner an interest in the shore of navigable waters, subject only to the paramount right of navigation, which interest he may vindicate by suit, we think there is good reason to believe, and therefore for the entry upon the shore below the wharf and carrying away the soil and manure, the plaintiff is entitled to recover; but it must be only nominal damages.

*Judgment for the plaintiff.*