Rockingham
No. 97-405

## G. WILLIAM PURDIE

v.

## ATTORNEY GENERAL

June 24, 1999

*Upton, Sanders & Smith,* of Concord (*Frederic K. Upton* on the brief and orally), for the plaintiffs.

*Philip T. McLaughlin,* attorney general (*Jennifer J. Patterson,* assistant attorney general, on the brief, and *Leslie J. Ludtke,* associate attorney general, orally), for the State.

*Michael L. Donovan*, of Concord, by brief for the Town of Rye, as *amicus curiae*.

*Nancy L. Girard*, of Concord, by brief for the Conservation Law Foundation, as *amicus curiae*.

*Noucas & Keenan, P.A.*, of Portsmouth (*Christopher W. Keenan* on the brief), for Concerned Citizens of the Seacoast, as *amicus curiae*.

*Devine, Millimet & Branch, P.A.*, of Manchester (*Thomas Quarles, Jr.* and *Thomas F. Irwin* on the brief), for Audubon Society of New Hampshire, New Hampshire Wildlife Federation, Appalachian Mountain Club, and New Hampshire Rivers Council, as *amici curiae*.

BRODERICK, J. The State appeals an order of the Superior Court (*McHugh*, J.) denying its motion for summary judgment and granting the plaintiffs' motion for summary judgment. The plaintiffs are approximately forty beach-front property owners in Rye. The trial court ruled that RSA chapter 483-C (Supp. 1998), which defines the public's trust rights in coastal shorelands, effects an unconstitutional taking of private property. On appeal, the State argues that: (1) the legislature had authority to establish a statutory boundary line for public trust rights in coastal shorelands; (2) issues of material fact were disputed; (3) the trial court erred in making factual findings and relying on policy considerations in granting the plaintiffs' motion for summary judgment; and (4) the trial court abused its discretion by rejecting the State's offer of new evidence to disprove the court's erroneous factual findings. We affirm.

I

In 1995, the legislature enacted RSA chapter 483-C, which recognizes the State's public trust rights in "all shorelands subject to the ebb and flow of the tide to the high water mark and subject to those littoral rights recognized at common law." RSA 483-C:1, II. The statute defines "high water mark" as the highest "syzygy" line or "the furthest landward limit reached by the highest tidal flow" over the nineteen-year tidal cycle, excluding "abnormal" storms. RSA 483-C:1, V. Soon after the statute was enacted, the plaintiffs brought an action asserting that the statute effected a taking of their property without just compensation in violation of Part I, Article 12 of the New Hampshire Constitution and the Fifth Amendment of the United States Constitution.

To limit the issues for trial, the parties agreed to file cross-motions for summary judgment. In ruling for the plaintiffs, the trial

court concluded that "settled" common law defines the term "high water mark" as the "mean high tide line," and therefore the legislature's action in setting the boundary line at the highest elevation of tidal action was an unconstitutional extension of public property rights and a taking of the plaintiffs' property. The State's motion for reconsideration was denied, and this appeal followed.

## II

■ We first address the State's argument that the trial court erred in denying its motion for summary judgment because the legislature acted within its authority in establishing the "high water mark" as the boundary for public trust rights in coastal shorelands at the highest elevation of tidal action. The plaintiffs contend that this issue was not preserved for our review because the State's notice of appeal did not specifically assert that the court erred by denying its motion. We disagree. The first question raised on appeal was "[w]hether the New Hampshire legislature has authority to establish a statutory public boundary elevation when that elevation is within the ebb and flow of the tide." This was the principal legal issue raised in the State's summary judgment motion. Therefore, the issue was adequately preserved for our review. *See* SUP. CT. R. 16(3)(b) ("question presented will be deemed to include every subsidiary question fairly comprised therein").

"When reviewing the denial of a motion for summary judgment, we consider the pleadings and any accompanying affidavits, and all proper inferences drawn from them, in the light most favorable to the nonmoving party." *Mahan v. N.H. Dep't of Admin. Services*, 141 N.H. 747, 748, 693 A.2d 79, 81 (1997). "[S]ummary judgment may be granted only where no genuine issue of material fact is present, and the moving party is entitled to judgment as a matter of law." *Goss v. City of Manchester*, 140 N.H. 449, 450-51, 669 A.2d 785, 786 (1995) (quotation omitted).

The State argues that it was entitled to summary judgment because the statutory definition of "high water mark" in RSA chapter 483-C merely codifies New Hampshire common law establishing public property rights in the shoreland at the highest high tide mark. The plaintiffs contend, and the trial court found, that the common law limits public ownership of the shoreland to the "mean high tide," or the average of all high tides over a nineteen-year tidal cycle, regardless of weather conditions. Both parties agree that lands subject to the ebb and flow of the tide are held in public trust. *Opinion of the Justices (Public Use of Coastal Beaches)*, 139 N.H.

82, 89, 649 A.2d 604, 609 (1994). Moreover, no one disputes that the common law boundary line between public and private ownership of the shorelands is at the high water mark. *Concord Co. v. Robertson*, 66 N.H. 1, 27, 25 A. 718, 730-31 (1889). Therefore, whether the legislature followed common law in setting the boundary line at the highest elevation of tidal action depends on how the common law defines the high water mark.

The nature of the high water or high tide mark has been subject to different interpretations because the furthest landward reach of the water varies with each high tide. Maloney & Ausness, *The Use and Legal Significance of the Mean High Water Line in Coastal Boundary Mapping*, 53 N.C. L. REV. 186, 195-98 (1974). Because both parties rely on our decision in *Opinion of the Justices (Public Use of Coastal Beaches)*, 139 N.H. 82, 649 A.2d 604, we begin our analysis with a review of that case.

In *Opinion of the Justices (Public Use of Coastal Beaches)*, we advised the legislature that proposed legislation, which would create a public easement in the "dry sand" area along New Hampshire's beaches, would constitute a taking of private property without just compensation. *Id.* at 91-94, 649 A.2d at 609-11. The first question presented for our consideration was "[w]hether New Hampshire law identifies a particular coastal feature or tidal event as outlining the maximum shoreward extension of the public trust area boundary . . . . " *Id.* at 87, 649 A.2d at 607. After stating that "[t]he introduction of any line other than high-water mark as the marine boundary would overturn common-law rights that had been established here," *id.* at 89, 649 A.2d at 608, we noted:

> While it is settled . . . that the public trust in tidewaters in this State extends landward to the high water mark, the following *common law questions* are not settled: what is the high water mark; where is it located; and how is it located. We do not purport to determine in this opinion answers to such questions.

Id. (emphasis added).

The State contends that, by leaving the questions relating to the nature and location of the high water mark unanswered, we were inviting the legislature to decide those issues. The State, however, misreads our holding. In *Opinion of the Justices (Public Use of Coastal Beaches)*, we characterized those issues as "common law questions." The determination of common law questions is a judicial, not a legislative, function. *See Cloutier v. State Milk Control Board*, 92 N.H. 199, 201-02, 28 A.2d 554, 556 (1942). Under the Separation

of Powers Doctrine, *see* N.H. CONST. pt. I, art. 37, we could not, and did not, delegate this function to the legislature. *See Cloutier*, 92 N.H. at 202, 28 A.2d at 556. The State apparently misconstrues our reluctance in an advisory opinion to address extraneous issues that may arise from the passage of proposed law as a delegation to the legislature to decide those issues for us. During oral argument, however, the State acknowledged that this court has the authority to "settle" the common law regarding the nature and location of the high water mark. Accordingly, we undertake this task today.

After an extensive review, we conclude that New Hampshire common law establishes the high water mark at the level of mean high tide. In 1862, this court referred to the public-private shoreland boundary line as the "ordinary high water mark." *Clement v. Burns*, 43 N.H. 609, 614 (1862) (emphasis added). Over one hundred years later, we held that public "[t]idewaters are those in which the tide *ordinarily* ebbs and flows." *Sibson v. State*, 110 N.H. 8, 10, 259 A.2d 397, 399 (1969) (quotation omitted) (emphasis added).

The context of the *Sibson* case makes clear that the common law public-private boundary line or "ordinary high water mark" was at the level of mean high tide. In support of our position, we cited *Borax Consolidated, Ltd. v. Los Angeles*, 296 U.S. 10 (1935), in which the United States Supreme Court held that the shoreland boundary for purposes of federal grants was the "ordinary high water mark," which it defined as the "mean high tide line," that is, "the average height of all the high waters" over a complete tidal cycle. *Borax Consolidated*, 296 U.S. at 22-23, 26-27. Moreover, a similar issue was considered in *Sibson* after remand. *See Sibson v. State*, 115 N.H. 124, 336 A.2d 239 (1975) ("*Sibson II*"). Although the majority in *Sibson II* did not discuss the boundary line because it concluded that the State regulation at issue was not a taking, Justice Grimes, who determined the regulation was a taking, stated in a concurring opinion that he agreed with the majority that the State could regulate "that part of the marsh which lies below the mean high water mark of the Atlantic Ocean . . . because the State has an interest in the public waters," but not property lying "above mean high water, [because] the effect of the State's action is to compel the plaintiff to devote his land to a public purpose without compensation." *Sibson II*, 115 N.H. at 130, 336 A.2d at 243 (Grimes, J., concurring in part and dissenting in part).

Further, the definition of the term "ordinary" as used in *Clement*, 43 N.H. at 614, and the definition of the term "ordinarily" as used in *Sibson*, 110 N.H. at 10, 259 A.2d at 399, lend support to the

interpretation of the common law public-private shoreland boundary or high water mark as the mean high tide line. The word "ordinary" is defined as "occurring or encountered in the usual course of events: not uncommon or exceptional: not remarkable: routine, normal." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1589 (unabridged ed. 1961). Similarly, the word "ordinarily" is defined as "in the ordinary course of events" and "to the usual extent." *Id.* The term "ordinary," therefore, is synonymous with the term "mean." In fact, one of the definitions of the word "mean" is "ordinary." *Id.* at 1398-99 ("mean" also defined as "common" or "average").

Finally, New Hampshire common law regarding other public waters indicates that the mean high tide mark was intended as the public-private shoreland boundary. We have held that large ponds are owned by the State in trust for public use up to their "natural mean high water mark." *See, e.g., Allen v. Wetlands Board,* 133 N.H. 379, 380, 577 A.2d 92, 93 (1990); *State v. Stafford Company,* 99 N.H. 92, 96-97, 105 A.2d 569, 572-73 (1954). Moreover, we have noted that "[t]he law of public waters is presumably uniform, and on many questions it is not material whether an authority relates to tide-water or to large ponds." *Robertson,* 66 N.H. at 8, 25 A. at 721. Accordingly, we conclude that the mean high tide is the high water mark or common law coastal boundary between public and private shorelands.

Our holding today is consistent with the law in most of the other coastal States. *See, e.g., Nollan v. California Coastal Comm'n,* 483 U.S. 825, 827 (1987) (California law); *Shorefront Park Improvement Association v. King,* 253 A.2d 29, 33 (Conn. 1968); *State v. Ibbison,* 448 A.2d 728, 732 (R.I. 1982). The few States that reject the mean high tide mark as the public-private shoreland boundary do so on distinct histories not applicable to our State. *See, e.g., Application of Ashford,* 440 P.2d 76, 77 (Haw. 1968) (Hawaii boundary based on Hawaiian King's issuance of royal patents in 1866); *Bell v. Town of Wells,* 557 A.2d 168, 171-72 (Me. 1989) (Massachusetts and Maine adopted mean low water as boundary line based on 1647 Massachusetts ordinance); *cf. Opinion of the Justices (Public Use of Coastal Beaches),* 139 N.H. at 88-89, 649 A.2d at 608 (refusing to adopt Massachusetts rule for New Hampshire).

■ Having determined that New Hampshire common law limits public ownership of the shorelands to the mean high water mark, we conclude that the legislature went beyond these common law limits by extending public trust rights to the highest high water mark.

Although the legislature has the power to change or redefine the common law to conform to current standards and public needs, *see Opinion of the Justices*, 101 N.H. 527, 529, 132 A.2d 613, 614-15 (1957), property rights created by the common law may not be taken away legislatively without due process of law, *see Opinion of the Justices (Public Use of Coastal Beaches)*, 139 N.H. at 93, 649 A.2d at 611. Because RSA chapter 483-C unilaterally authorizes the taking of private shoreland for public use and provides no compensation for landowners whose property has been appropriated, it violates the prohibition in Part I, Article 12 of the State Constitution and the Fifth Amendment of the Federal Constitution against the taking of property for public use without just compensation. *See id.*; *cf. Nollan*, 483 U.S. at 831-32 (statute granting the public a comprehensive recreational easement in privately owned tidal land, without compensating such owners, was an unconstitutional taking). Although it may be desirable for the State to expand public beaches to cope with increasing crowds, the State may not do so without compensating the affected landowners. *See Opinion of the Justices (Public Use of Coastal Beaches)*, 139 N.H. at 94, 649 A.2d at 611; *Eaton v. B.C. & M.R.R.*, 51 N.H. 504, 518 (1872). Accordingly, we conclude that RSA chapter 483-C is unconstitutional because it constitutes a taking of private property without just compensation, and therefore the trial court's denial of the State's motion for summary judgment was proper.

## III

We need only briefly address the State's remaining arguments. The State argues that the trial court erred in granting the plaintiffs' motion for summary judgment because there were disputed issues of material fact, and that it erred by refusing to admit new documents submitted with the State's motion for reconsideration. Our conclusion that the common law public-private coastal boundary line or high water mark is the mean high tide disposes of these arguments.

The State specifically contends that there were disputed issues of material fact concerning the nature and extent of individual plaintiffs' property rights, the location of the statutory "high water mark," the public's historical use of the beach, and the plaintiffs' actual understanding of their property boundaries. We need not address these issues because they are not material to the disposition of this petition for declaratory judgment. *See N.E. Tel. & Tel. Co. v. City of Franklin*, 141 N.H. 449, 452, 685 A.2d 913, 916

(1996). The trial court was presented with cross-motions for summary judgment. Both parties agreed that New Hampshire common law established the public-private coastal boundary line at the high water mark. The *only* legal issue in dispute before the trial court was whether the statutory definition of the "high water mark" comported with the common law boundary line for public-private shorelands.

■ Because we have determined that the trial court properly held that New Hampshire common law establishes the high water mark or public-private shoreland boundary at the mean high tide line, the only remaining material issue is the precise location of the mean high water mark. The parties, however, did not raise this issue in their respective summary judgment motions. Even if the record contains documents, disputed or not, relevant to the precise location of the mean high water mark, consideration of that issue was beyond the questions presented to the trial court for summary judgment. Thus, evidence was not presented on the actual location of the mean high water mark, and therefore the issue is not ripe for our review. *Cf. Appeal of Tancrede*, 135 N.H. 602, 603-04, 608 A.2d 1308, 1308-09 (1992).

The State also argues that the trial court erroneously made factual findings by comparing the process of determining the mean high water mark with that of the statutory "high water mark" and that the court erroneously relied on policy considerations in doing so. To the extent the trial court erred in the manner suggested by the State, such errors were of no consequence because the court's legal conclusion that the mean high tide constitutes the common law public-private coastal boundary was correct as demonstrated by our holding today. *Cf. Suojanen v. Tardif*, 121 N.H. 1036, 1039, 437 A.2d 310, 312 (1981) (wrong reason given by court does not invalidate correct ruling).

Because the actual location of the mean high water mark still needs to be decided to determine which, if any, of the plaintiffs have a claim for damages, we remand this case to the trial court for further proceedings consistent with this opinion.

*Affirmed and remanded.*

HORTON, J., did not sit; THAYER, J., sat but did not participate; the others concurred.