Merrimack, }
  Dec., 1900. }

## STATE & *a. v.* SUNAPEE DAM CO.

A charter conferring the right to control within definite limits the outflow from a body of water held by the state in trust for public use, is a legitimate exercise of legislative power; and a lowering of the water level to the point authorized by such charter, if done in a reasonable manner, does not constitute an infringement of public or private rights which can be restrained by a court of equity.

A corporation which has acquired the right to control within definite limits the outflow from a large natural pond is liable in damages for injuries to public and private rights occasioned by unreasonably raising the water level beyond the point established; but in such case the restraining power of a court of equity cannot ordinarily be invoked when it appears that a repetition of the acts complained of is improbable and the financial responsibility of the defendants is unquestioned.

BILL IN EQUITY, for the ascertainment and enforcement of public and private rights in Sunapee lake. Facts found by a referee.

*Sargent & Niles, Eastman & Hollis, George R. Brown,* and *Streeter, Walker & Hollis,* for the plaintiffs.

*Ira Colby* and *Albert S. Wait*, for the defendants.

BLODGETT, C. J.    December 7, 1820, upon the petition of certain mill-owners on Sugar river, which has its source in Sunapee lake, one of the public waters of the state, the defendants were incorporated and made a body politic " to sink the outlet of said lake at the source of said Sugar river to the depth of ten feet below the low-water mark of said lake, and to erect and maintain a dam there with suitable gates and flumes to the height of said low-water mark, for the benefit of the mills and mill privileges aforesaid; provided said corporation shall make or tender reasonable compensation for all damages which may accrue to individuals by the erection of said dam and works." The corporation was organized the following year, and soon after its organization built a dam at said outlet, at a height which has remained unchanged, and by means of such dam has since controlled the outflow of the lake.

The present proceeding is to restrain an alleged infringement of public and private rights in and to the waters of the lake, through changes in the water level occasioned by the maintenance of the defendants' dam and works, and is instituted under the general equity powers of the court, and particularly under section 3, chapter 205, of the Public Statutes, which provides that "any legal right, public or private, infringed by a change in the water level of a natural lake or pond, . . . may be ascertained and enforced in a constitutional manner on a bill in equity without prior ascertainment of the right by a suit at law; and rights of boating, fishing, and navigation may be enforced on a bill in equity brought by the attorney-general in the name of the state." The plaintiff, the state of New Hampshire, complains of an infringement of the public rights of navigation and fishing, and of injury to its fish hatcheries.    The plaintiff, the Woodsum Steamboat Company, complains of an infringement of the public right of navigation to its special damage, and of its rights as a littoral proprietor.    The other plaintiffs are littoral proprietors upon the lake, and complain of an infringement of their rights as such.

It being found that the defendants have not drawn down the waters of the lake to a point below that authorized by their charter without any restriction as to times or seasons when it might be done, all the plaintiffs are apparently remediless upon this branch of their case if the legislature had authority to make the grant. While the question thus presented is both interesting and important, as well as one upon which there is more or less diversity of judicial opinion in different jurisdictions, extended discussion of it is not now deemed to be necessary, in view of the recent decisions

in *Conn. River Lumber Co.* v. *Company*, 65 N. H. 290, and *Concord Mfg. Co.* v. *Robertson*, 66 N. H. 1, in both of which public, private, and chartered rights were exhaustively argued by counsel and carefully considered by the court. An examination of those cases will show that the doctrine enunciated in both of them, so far as it is directly applicable to the present inquiry, is that while in this state lakes, large natural ponds, and navigable rivers are owned by the people, and held in trust by the state in its sovereign capacity for their use and benefit, such use and benefit are not limited to navigation and fishery, but include all useful and lawful purposes ; and that the beneficiaries and the trustee, acting as a body politic and trustee, can authorize by their legislative agents even an extinguishment of the trust and an abandonment of the trust estate. *Conn. River Lumber Co.* v. *Company, supra,* 378, 384–388 ; *Concord Mfg. Co.* v. *Robertson, supra,* 6, 7, 8, 12, 19, 22.

These decisions, in addition to the high source whence one of them came, commend themselves to our judgment by their intrinsic soundness ; and we are accordingly constrained to hold that the defendants' charter was such an one as the legislature had the power to grant. If this be so, our duty is simply to construe the charter,— not to rejudge it. It is for the legislature alone, " as the sole depository of the sovereignty of the state, . . . to judge of the public interests and welfare in the disposition and use of its public waters." As was well said by Mr. Justice *Story* in *Charles River Bridge* v. *Warren Bridge,* 11 Pet. 420, 605 : " Whether the grant of a franchise is, or is not, on the whole, promotive of public interests, is a question of fact and judgment upon which different minds may entertain different opinions. It is not to be judicially assumed to be injurious, and then the grant to be reasoned down. It is a mattter exclusively confided to the sober consideration of the legislature, which is invested with full discretion and possesses ample means to decide it. For myself, meaning to speak with all due deference for others, I know of no power or authority confided to the judicial department to rejudge the decisions of the legislature upon such a subject. It has an exclusive right to make the grant, and to decide whether it be, or be not, for the public interest. It is to be presumed, if the grant is made, that it is made from a high sense of public duty, to promote the public welfare, and to establish the public prosperity." Such being the respective rights of the legislature and the court, the defendants' charter can be annulled or modified, if at all, not by a court of equity, but only by the authority by which it was granted.

It follows from these conclusions that the mere lowering of the lake by the defendants to the charter point can afford the state and the public no well-founded ground of complaint if done in a

reasonable manner; and *a fortiori*, much less can the lowering of it only about two and one half feet, which is the extent of the defendants' acts in that regard, so far as appears. And certainly the littoral proprietors, as such, can have no better ground of complaint, because, as is well understood, in public waters there is no private ownership in the soil below ordinary high-water mark. The primary ground of their grievance, and the one from which all the others follow, is the uncovering of a portion of the land underlying the water between the high and low-water mark. "But," as is said by the defendants' counsel, "the state, and not these individual plaintiffs, is the owner of the lake and of the soil to high-water mark, and had a right to confer its use and enjoyment upon its grantee. If this affords some inconvenience to the plaintiffs in reaching the water, or lessens the enjoyment of residences upon or near the lake shores, there is no legal ground of complaint; it is purely *damnum absque injuria.*" See *Fay* v. *Aqueduct Co.*, 111 Mass. 27, 28, 29, and authorities cited.

But while the plaintiffs have no well-founded ground of complaint occasioned merely by the lowering of the lake within the charter limit, the defendants, notwithstanding their charter, were bound to exercise the right so obtained in a reasonable manner, not only as to the plaintiffs, but as to all others having rightful interests upon the shores or in the waters of the lake, and are justly subject to liability for failure to do so. Nevertheless, we think the rights expressly conferred by the charter must be regarded as paramount to and as necessarily impairing to some extent such other interest; and therefore, while the defendants' management of their dam in respect of low water in 1880 or 1881 may properly have been open to the adverse criticism bestowed upon it by the referee, still, in view of the limited extent to which the defendants have exercised their right to lower the lake and their sixty years user of it without objection, and in the absence of any finding that the water has ever been drawn below what was necessary for the beneficial operation of the machinery on the river, or that the defendants have made an intentional misuse of the water, or have intended in any way to cause unnecessary annoyance and damage to the plaintiffs, we are of opinion that no case is established by the reported facts which entitles the plaintiffs, or any of them, to equitable relief.

In respect to the raising of the water to an unusual height, another and quite a different case is presented. The defendants' charter authorizes the erection of a dam to low-water mark only, whereas the height to which they originally constructed and have since maintained it is the natural high-water mark; or, in other words, two feet above the point authorized by the charter. This

maintenance, however, so far as appears, caused no injury to the shore-owners or to the public up to 1851, when, as is found by the referee, in order to enable them to draw the water to a lower depth, the defendants sunk the channel of the river below the dam to the depth of two and one half feet or more, reconstructed the dam, removed obstacles to the flow of the water from the channel above it, and by means of these changes and the addition of flash-boards to the dam, created a higher level of the water, which caused injury to the shore-owners upon the lake by the flowage of their lands. Some of them subsequently brought suits therefor and received compensation through an adjustment made with them by the defendants involving the "acknowledgment of liability, determination, and satisfaction of damages." One of the suits so adjusted was that of John Pike, which, in addition to the payment of damages, resulted in an agreement, made in 1855, between him and the defendants, that the water should not thereafter be raised to a higher level than is now indicated by the figures "10" upon a gauge at the dam.

Upon the reasonable construction which the Pike agreement is entitled to receive, no violation of it by the defendants appears until 1897. During the spring and summer of that year, especially in May and June, it is found by the referee that "an exceptionally large quantity of rain fell, and the waters of Lake Sunapee were extremely high; and before or during this period of high water, the level of the lake was further raised by putting additional plank upon the dam." He further finds that "the evidence did not clearly indicate by whom such additional plank were placed upon the dam; but Mr. Abbott, who at the time had charge of the dam, knew they were on and permitted them to remain until June 12, thus continuing the level of the water to an unusual height for an unreasonable length of time. The directors of the defendant corporation did not direct Mr. Abbott to put those additional plank upon the dam, or to continue them upon it; and upon the complaint of parties whose property and rights were affected by the high water, the directors, on June 12, 1897, ordered Mr. Abbott to draw off and lower the water." It is further found that "although the high water of May and June, 1897, rendered it much more difficult to regulate the water and secure an even and uniform flow or level, thereby subserving the interests of the shore-owners and those interested in navigation, as well as the proprietors of mill privileges on Sugar river, yet, had one of the directors, at least, given his personal attention to it, or had the dam been managed by Mr. Abbott as it had been by Mr. Flanders [the former manager], much, if not all, of the injury complained of would have been either avoided or diminished"; and that "the effect of

this management of the dam was to raise the water of the lake to such an extent as to submerge the wharves of the steamboats, as well as those of others, to injure and destroy some of those wharves, flood some cellars upon the shores, and wash and injure beaches upon the properties respectively of the plaintiffs Quackenbos and Hay, and injuriously affect the state's fish hatchery on the shore of the lake." And in addition to the foregoing findings, the referee also finds there was no evidence of any claim by the defendants since 1855 of a right to raise the water above the point agreed upon with Pike, and that during May and until June 12, 1897, "the use of the waters of the lake by the defendant corporation was not a reasonable use of such waters."

Whatever the legal rights of the defendants may be in Sunapee lake, they are, as before stated, bound to exercise them in a reasonable manner; for in this state the law of public waters is what justice and reason require (*Concord Mfg. Co.* v. *Robertson, supra*, 22); and while the foregoing findings leave no room for doubt that the right to an assessment of compensatory damages in favor of those of the plaintiffs who may be legally entitled thereto is established in the particular instance referred to,— yet, in view of the circumstances attending it, as detailed by the referee, the improbability of its repetition, and the unquestioned ability of the defendants to respond in damages, we do not think a case is made which at this time calls for the restraining power of equity by way of injunction.

*Case discharged.*

Pike, J., did not sit: the others concurred.