Coös,
June 2, 1942. } No. 3326.

St. Regis Paper Company *v.* New Hampshire Water Resources

Board *& a.*

*Bernard Jacobs* and *Horace R. Lamb* (of New York) (*Mr. Lamb* orally), for the plaintiff.

*Richard F. Upton* and *Robert W. Upton* (*Mr. Robert W. Upton* orally) for the Water Resources Board and its directors.

*Frank R. Kenison*, Attorney-General (with *Ernest R. D'Amours*, Assistant Attorney-General of counsel), *pro se*.

ALLEN, C. J.   The legislation creating the State Water Resources Board provides for a state enterprise to be undertaken with some application of the law of private relations.   But the State's interest is dominant and controlling, and rules of private law govern only in certain respects the manner of financing, establishing, constructing and maintaining a project.   It was evidently thought that as a means to an end projects within the Board's authority might be better undertaken, developed and operated, not by private parties, but on a basis of private relationships to the extent prescribed by the legislation.   The legislation draws no specific boundary line marking the application of private or public law in the conduct of the Board's undertakings, and no application of private law is to be declared beyond the clear intendment of the legislation.   The undertakings being public, public law governs except as the legislation provides otherwise.

While the Board is liable to suit "in the same manner as a private corporation," the extent of liability is far short of that of general private liability, and is limited to such as is thought to be in furtherance of the execution of a project.   So far as liability may tend to defeat the objectives of the legislation, it is not imposed by the provision for suits against the Board.   As a general governing rule of demarcation, private liability inheres for the Board's contracts duly entered into and for wrongful conduct in the performance of its functions and projects, but not for the plans and undertaking of a project within its authority and approved and directed by the Governor and Council.

The Board is a branch of the executive department of the State government.   Although nominally created by the legislation as a

corporation, its status as a separate entity is only an illusory one of words. As a state agency it stands on the same footing as any un-incorporated administrative bureau. Its five directors manage it, but the act (Laws 1935, c. 121) does not constitute them members. The State is the sole member, and in the realm of facts it has but imaginary existence apart from that of the State itself. The concept that one may be one's own agent disregards actuality, and its expression is merely convenient phraseology in serving to define re-lations of authority, duties and liabilities. Differing from the ordi-nary corporation, the Board is not a body or group of members asso-ciated with internal and external relations, and as a corporation sole, it is the sole beneficiary of its own legal existence. The Board with-out its fictitious garb of appearance as an offspring of the State would be shorn of none of its authority and functions and would be under no different relations with those with whom it enters into re-lationship in the conduct and performance of its undertakings. Within circumscribed limits the State, by the legislature, has pre-scribed the terms and conditions upon and under which it may act in engagement of its functions. In short, the relation between the State and the Board is not one of principal and agent, but the Board is an agency which is a part of the State government.

The Board has been constituted to perform a governmental func-tion. The creation of its fictitious independent existence apart from that of the State government is merely a denotive statement in aid of powers delegated, functions assigned, duties prescribed, and liabil-ities assumed by the State in respect to its activities. In its aspect as a private corporation, its aspect as a public agency at all times prevails and controls. Fundamentally and in essential principle the controversy here is between the plaintiff and the State, which has consented to be sued in a roundabout manner. Any decree granting the plaintiff relief would be in every practical and effective sense against the State, with such remedy of enforcement as the legislation permits.

The only purpose and effect of the legislation in establishing the Board as a corporate entity is to provide special rules for the conduct and relations of the Board as exceptional to those otherwise applica-ble to a state agency, and this feature of the legislation must receive consideration for its bearing on other features.

As preliminary matters of attention, it was error to deny the Attorney-General's motion that the bill, in seeking to make him a party without his consent, be dismissed. The finding that he took

part in the trial of the suit on its merits is set aside. His presence during the trial was not participation, and the record is bare of evidence to sustain the finding.

Any requirement that he be joined as a party would be based on one or both of two theories. One is that it was his duty in behalf of the State to assert, or at least to authorize the assertion of, the plaintiff's claim of public interest. Short of this theory is one that by his appearance in the suit as the representative of the State it would be bound by any decree based upon a determination of the public interest.

Neither theory is valid. It is said in *Blanchard* v. *Railroad*, 86 N. H. 263, 265: "When the state, by those having its authority, takes either a positive or neutral position in respect to the public interest, it determines what the claim of public interest is." In the case here the Attorney-General has taken a position of neutrality in behalf of the State, and this determination of his duty, exercised in good faith, is not subject to judicial appeal or review at the demand of individuals. Since the State cannot be sued directly or indirectly without its consent (*Western Union &c. Co.* v. *State*, 64 N. H. 265, 271; *Bow* v. *Plummer*, 79 N. H. 23, 24; *Conway* v. *Board*, 89 N. H. 346, 348), and since it has here given no consent, except to permit suit against the Water Resources Board as its agency, the plaintiff's right to have the Attorney-General joined as a party must be denied.

Moreover, in the permission of suit against the Board, the State has in effect and reality consented to suit against itself. Decision of the public interest is as binding upon it in its standing as a party privy as though it were a party in its own name. But the Board may act without required reference to the Attorney-General. In its necessarily implied authority to deny, in behalf of the State, the plaintiff's claim of a public interest, it is seriously doubtful whether the Attorney-General might rightfully join with the plaintiff in assertion of its claim. In this respect the Attorney-General's authority has very arguably been transferred to the Board, as the effect of the legislation creating it.

Nor in the aspect of the Board as a private corporation is the Attorney-General's intervention as a party a requirement. While he was joined as a party in *Connecticut River &c. Co.* v. *Company*, 65 N. H. 290, it was to avoid doubts, "without considering the question whether the bill" could be maintained by the plaintiff (*Ib.*, 377). Later cases show that in private litigation the Attorney-General may not be made an involuntary party. *Whitcher* v. *State*, 87 N. H. 405,

406; *Hoban* v. *Bucklin*, 88 N. H. 73, 76. In such litigation the principle of *res adjudicata* by which only the parties to the litigation are bound by the judgment rendered therein serves to protect the State in respect to any decision of the public interest upon which the judgment is founded.

The bill should also have been dismissed as to the personal defendants both as directors and individually. Their alleged wrong is not in acting *ultra vires* nor in usurping powers, but in the improper exercise of the powers delegated them. As state officials they are under no personal liability for performance of their judicial functions in ascertaining facts and deciding thereon. *Sweeney* v. *Young*, 82 N. H. 159; *LaBonté* v. *Berlin*, 85 N. H. 89, 91. As directors they are under no present liability to the plaintiff. Any order against the Board would require its performance by the directors in office at the time of the order, who may or may not be those now joined as defendants. In this respect the case stands the same as any suit praying for an order or decree against a corporation to abate a nuisance. The duty to abate is to be performed by its proper officers and agents, but the claim of nuisance is here, in analysis as already shown, made against the State as the real and ultimate party whose interests are at stake and whose wrong is alleged. Any order on the directors of the Board to abate would be tantamount in final effect to an order against the State.

So far as the plaintiff relies on any contractual obligation of the Board arising from certain statements of the Board's chairman in discussion of the plans, his authority to speak for the Board or for the Governor and Council has not been shown, even apparently. The plaintiff was chargeable with knowledge of his and the Board's "official limitations" (*Lawrence* v. *Toothaker*, 75 N. H. 148, 149), and could not rely upon an "asserted or assumed exercise of authority not possessed" (*Storrs* v. *Manchester*, 88 N. H. 139, 142). The chairman's statements resulted in no loss or damage to the plaintiff.

The legislation relates to the "conservation and distribution of water and the regulation of the flow of rivers and streams." Laws 1937, c. 118, s 1. The reference is to water, rivers and streams which are public. Until disposed of, by grant from the legislature of ownership or easement therein, they belong to the State in full and unrestricted title. As sometimes expressed, the State holds them in trust for the public. But the public right is a state right which the legislature may control, take away or cede at its will.

"An individual may convey his property upon such terms and

conditions consistent with law as he pleases.   The power of the State cannot be less.   It is sovereign except in so far as its powers are limited by the state and federal constitutions.   No constitutional provision has been pointed out or discovered which denies to the state the power to convey whatever it has the right to convey — whether lands or franchises — upon such terms and conditions as to the legislature may seem fit."   *State* v. *Railroad*, 69 N. H. 35, 51.   "The Connecticut easement is public property that can be abandoned by due action of the government."   *Connecticut River &c. Co.* v. *Company*, 65 N. H. 290, 386.   ". . . while in this state lakes, large natural ponds, and navigable rivers are owned by the people, and held in trust by the state in its sovereign capacity for their use and benefit, such use and benefit are not limited to navigation and fishery, but include all useful and lawful purposes; and . . . the beneficiaries and the trustee, acting as a body politic, can authorize by their legislative agents even an extinguishment of the trust and an abandonment of the trust estate."   *State* v. *Company*, 70 N. H. 458, 460.   Citation of other authorities in support of this view is unnecessary.   The view is too well grounded and unquestioned.

When a river or stream is capable in its natural state of some useful service to the public because of its existence as such, it is public. Navigability is not a sole test, although an important one.   *State* v. *Company*, *supra*, 460.   Although the line between public and private ponds has been drawn on the basis of acreage, that between public and private streams has not been and is to be determined as a question of fact under the test stated.

Since the public right is not a private one, it follows that individual members of the public entitled to enjoy the right enjoy the right in a personal capacity only derivatively.   Their rights are not property rights and are not vested.   Strictly, the rights are more properly to be termed privileges, which may be taken away, altered or qualified. Aside from their treatment under the constitutional principle of equality, the privileges are all measured by the extent of the public right.

From the standpoint of reality, the existence of rights in the public as other than those of the State is only a legal concept.   The public lacks even a legally created personality or entity.   In thought it exists as an unexclusive group of persons, natural and artificial, including all who are subject to the State's jurisdiction.   It may neither sue nor be sued as such.   The reality is that each of those who form the group has rights in the nature of privileges granted by

the State, and which the State may uphold in litigation either by taking original action or by intervention. The individual's privileges are a form of rights for the violation of which by another individual he may have recourse in the courts for their vindication and redress, but, as has been said, the determination of the issue of privilege is not *res adjudicata* except between the parties to the controversy, and the State if not a party is bound only to the extent everyone is bound by judicial declaration of the law. It is only for convenience of thought and its statement that the public is regarded as a distribution center of rights.

This privilege is to be distinguished from riparian rights which are property rights and which may not be invaded or taken from the owner without compensation. But riparian rights include no rights against the State in the exercise of its due control of the, public waters which the riparian owner's land reaches. The exercise of control may not rightfully damage the land but it may affect its value. If the legislature saw fit to permit the lowering of Lake Winnipesaukee to the detriment of owners of property on its shores, they would be without legal redress, but if the Lake were raised to flow upon their land, it would be valid only under condemnation and an award of damages. "The flow of a navigable stream is in no sense private property; 'that the running water in a great navigable stream is capable of private ownership is inconceivable.' Exclusion of riparian owners from its benefits without compensation is entirely within the Government's discretion." *United States* v. *Company* 311 U. S. 377, 424. While in this jurisdiction the rights of the State's ownership and control may become private property through legislative grant, yet it remains that riparian owners adversely affected may have relief only through further legislative action.

"There is another class of cases distinguishable from the present by the fact that the complainant in those cases had been deprived only of the privilege which he had enjoyed, in common with the rest of the public, of using public property. No private or exclusive right is invaded. The act complained of is merely a regulation of a public right. Suppose that the State cause or authorize an obstruction to the navigation of a navigable river which belongs to the State, but do not thereby invade or flood the lands of the riparian owner. The diminished facilities for navigation may render the adjacent land less valuable; but so may a lawful change in the mode of occupying an adjacent tract of land belonging to a private owner. The riparian owner's land remains intact. He is only 'deprived of

the use of what was never his own.' " *Eaton* v. *Railroad*, 51 N. H. 504, 524.

The analogy between a public waterway and an ordinary highway is largely one of identity in respect to public and derived private rights. The private right is by virtue of an individual's membership in the public, and the use of an ordinary highway is a privilege to be taken away or regulated by the State at its pleasure. *State* v. *Sterrin*, 78 N. H. 220; *Johnson* v. *Railroad*, 83 N. H. 350; *Rosenblum* v. *Griffin*, 89 N. H. 314, 318; *State* v. *Cox*, 91 N. H. 137. While damage occasioned an abutting owner upon a discontinuance of a highway is provided by statute, no legislation has been enacted providing for damages, even of a special nature, resulting from authorized changes in the State's public waters.

The plaintiff places stress on the case of *Cram* v. *Laconia*, 71 N. H. 41. It is not in point. The question there was one of construction of the statute providing for damages "sustained by any person by the discontinuance" of an ordinary highway. It was held that the statute permitted no allowance for general damages, but only for those of a special character and allowed only to abutters deprived of all highway access by the discontinuance. The plaintiff here cannot claim such a deprivation, even if it be regarded as an owner of lands abutting the river. It has other means of access from its lands to points it desires its pulpwood to reach, even if, as in the *Cram* case, they are less advantageous. As the opinion states (*p.* 53): "At most, it is a hardship resulting from the mere operation of a public improvement, involving no taking of property and no interference with vested rights. As such, it falls within that class of general injuries, . . . to which the few are ever being subjected for the good of the many, and for which the law allows no compensation but the privileges and protection of government, . . ."

In analysis the plaintiff's claim of special damage is misconceived. It is specially affected because it is the chief owner of the forest lands in the drainage area above the dam. The right of the public may not be available for many of its members, but that fact does not give those affected rights not generally existing. The test of occasion to receive the benefit of the right may be localized, but no peculiar privilege arises therefrom. The plaintiff stands no differently than if its holdings were divided into many titles, all the owners of which asserted the public right. Special damages, as defined in the *Cram* case, are those for which legislation provides, and are not based on special rights of individuals in the public right.

It is true that in the *Cram* case it is said that "the abutter has a certain vested right in the highway upon which he is located, as a means of access to his property, for the destruction or impairment of which he has a cause of action" (*p.* 52). For the purposes of the case the statement was but *dictum*. If the theory that "the effect of the statute providing for damages is, to give to certain landowners vested rights in the continuation of a highway that has been laid out," (*Candia* v. *Chandler*, 58 N. H. 127, 129), is sustainable upon the ground that a layout implies some reciprocal grant of an easement to the abutters by the state or a municipality, it is difficult of application when the layout takes none of the abutter's land, and it is of equal difficulty of application to a highway established by prescription. Nor, would it seem, may the right to damages be regarded as based on an assumed obligation to pay "money to an individual, for a public purpose" (*State* v. *Company*, 60 N. H. 219, 260). But the question needs no decision here. No constitutional or statutory ordainment exists by which the plaintiff may be held to have received any endowment of vested rights in public waters. The State's ownership and control of them arise as an incident of its sovereignty, and not from any taking of private property for public uses.

Whether, in view of the extension of the protective power to meet changes in "industrial conditions, and political theories" (*Carter* v. *Craig*, 77 N. H. 200, 206, 207; *Sundeen* v. *Rogers*, 83 N. H. 253, 256, 257), the allowance of damages upon the discontinuance of an ordinary highway would now be held to be by legislative grace, and whether in that aspect it may be sustained as a valid exercise of legislative power, are not here pertinent inquiries.

The Board urges that the Connecticut River at the site of the dam was not navigable in its natural state for the purpose of floating the plaintiff's logs and pulpwood. For the purposes of the case the trial court's finding of such navigability is accepted. It is not questioned that the river all the way from its source is a public waterway, and the conclusion reached avoids the need of analysis of the public uses which the river furnished before the dam was built.

Whether the assumed right to float logs on the river past the site of the dam has been discontinued, abandoned, relinquished, or regulated, it has been abridged to the point of complete deprivation. The distinctions are not practical, even from a legal standpoint. No private rights except such as are derivative from the public right have been impaired. The impairment of the public right carried

with it the impairment of all private rights arising out of it. Regulation may not only control use and conduct but may bar use altogether. Prevention of use of the river for floating logs is on the same plane of legal power as, for example, zoning laws preventing prescribed uses of private property. In such laws the balance of seriousness between the public interest and the private right may determine their validity under the test of reasonableness. *Sundeen* v. *Rogers*, 83 N. H. 253, 256. Here, the private right, being only an incidental outgrowth of the public right, is dependent upon it, and the real question is whether the public right continues to exist. This question is not in the first instance resolved by any constitutional test of reasonableness. The pleasure of the legislature is controlled by no judicial oversight in this respect. Its decision is wholly political, and its policy may not be reviewed. But in delegating power to the Board, it is not to be assumed that the legislature's own power to act arbitrarily has been bestowed, and both as a general rule of statutory construction and as a conclusion to be drawn from various provisions of the legislation, action within the bounds of reasonable discretion is ordered. As a check upon arbitrary action the legislation (Laws 1937, c. 118, s. 3) provides that no project shall be undertaken until the Governor and Council order it after public hearing following which it is found that the project is of "public use and benefit and within the authority conferred upon the board." While the question of authority conferred is one of law not judicially determinable by the executive department of the state government, the question of "public use and benefit" is one of fact not to be reviewed by the courts.

The extent of power granted by the legislature to the Board in connection with the construction and maintenance of the Pittsburg dam becomes an issue of paramount and decisive importance. The issue is wholly of statutory construction.

The legislation was enacted under the pressure of economic demand to avoid flood losses and waste of potential energy. At the time of its passage in 1935 and 1937 the use of flowing water for logging transportation had become largely abandoned. This was particularly the situation with respect to the Connecticut, Pemigewasset and Merrimack Rivers, whose drainage basins were the source of a large part of flood disaster. As time went on the drives became more and more confined to the upper reaches of the rivers and less in volume. Above the Pittsburg dam no logs have been driven since 1915 and no pulpwood since 1928. In 1935 and 1937 the prospect of

a demand for a renewal of log driving on the Connecticut was doubtful and remote. Other methods of transportation had taken its place in full substitution. If the legislature gave any thought to the subject, it did not consider it important enough to make specific reservation of the public right in respect thereto. But it was of overall importance to provide for the needs for which the legislation was enacted, and no provisions in it are found which express or evince a restriction on the Board's authority, in the plan and undertaking of a project, to impair or destroy public uses of public waters, either as to all existing uses or as to any special use.

Since the plaintiff's claim is in ultimate effect against the State, the rule of construction that a state grant to an individual is limited to its express terms and their necessary implications (*Connecticut River &c Co.* v. *Company*, 65 N. H. 290, 380; *Concord &c. Co.* v. *Robertson*, 66 N. H. 1, 6; *State* v. *Hutchins*, 79 N. H. 132, 134) does not govern. On the contrary, the legislation conferring upon the Board its powers and authority, and containing terms of forceful expression in its purpose to provide for a public need, is to be read in the light of its purposes and to uphold the public interest as superior to that of the private claim in any doubtful view of the extent of its delegation of authority. "Not to read in what the language implies is to amend or repeal" (*State* v. *Cox*, 91 N. H. 137, 143), as much as to read in what is not implied.

Two guiding provisions showing the extent of delegation contained in the legislation are these: "To the extent that it may be necessary to carry out the provisions of this act, the corporation shall have power to use and control all public waters of the state and all waters of the state to which the state is entitled by reason of water rights owned by it." Laws 1935, *c.* 121, *s.* 5. And any project shall be "so far as possible self-liquidating and self-supporting." Laws 1937, *c.* 118, *s.* 4.

No question of improper delegation of authority is presented. There is "a declared policy" and "a prescribed standard" (*Ferretti* v. *Jackson*, 88 N. H. 296, 302) to develop projects for water storage and power which shall be self-sustaining and self-liquidating in their cost so far as possible. The legislation bounds the authority within which discretion may be employed, and by its terms the discretion within the bounds is extensive and general. The Board's power to "use and control" all public waters and all state-owned water rights necessary in the development and construction of projects is unfettered by any exceptions, and its determination of necessity is final

if the determination is a possibly reasonable one, subject to higher executive approval and order. The installation of a project may well require a curtailment or bar of the use of a stream for certain purposes, and the Board's control of the stream fairly, it is thought, implies and carries the right thus to curtail or bar. Projects are to be undertaken only if they show reasonable prospect of paying for themselves (*Conway* v. *Board*, 89 N. H. 346, 354). In the consideration of cost and ultimate payment, the use of water for other purposes than storage and power may be barred in the exercise of control, when such use demands costs so high as to make a project unfeasible, and may be of minor public importance compared with that of the project. Taking into account the disuse of the river at the site of the dam for floating logs and pulpwood when the project was undertaken, the remote prospect at that time of future occasion for such use, the advantages of a reservoir for flood control and for development of power, the demand that the project should not be a burden on the taxpayers if avoidable, and, in summary, the balance for the State between benefit and burden, neither the Board nor the Governor and Council are chargeable with arbitrary action in failing to provide a sluiceway or other means for floatage.

As further evidence to show the purpose to delegate a broad range of power, the legislation (Laws 1937, *c.* 118, *s.* 2) defines a project as including "all property, rights, easements and franchises relating thereto and deemed necessary or convenient for its operation, and shall embrace all means of accomplishing the purposes" of water storage and power. This was in amendment of the section of the first enactment (Laws 1935, *c.* 121, *s.* 2) in its definition of a project, and is in language designed to broaden, rather than narrow, the scope of a project. The "means" were such as the Board might in reason take, and, as has been said, abuse of discretion on its part is not a compelled conclusion. Within the confines of reasonableness and subject to higher executive approval, its authority had full play in the exercise of its delegated functions.

The plaintiff points to the statutory language authorizing the Board to reconstruct as well as to construct projects, in showing the Board's authority to make changes in the dam which will serve the plaintiff's demands. But the right to reconstruct is not the imposition of a duty owed the plaintiff. Whatever the right, it is controlled by the general scheme and features of the legislation. It is not independent of them, and without prescribing the conditions upon which it may be exercised, broadly it is governed by the terms which

authorize construction. Whether reconstruction is permissible only as a need beyond maintenance and as called for by loss from partial or complete destruction, and whether an order for it by the Governor and Council would be a prior condition of authority, are inquiries to which answer is not here in order. There is no command of the legislature to adapt the dam to the plaintiff's desired use of the river, as an incident of the authority to reconstruct.

In another aspect, the plaintiff would seem to be barred from the relief it seeks. The dam has been constructed and is the property of the State. While the Board is "liable to suit in the same manner as a private corporation," all of its property and all "held in the name of the state" pursuant to the act "shall be exempt from levy and sale by virtue of an execution and no execution or other such judicial process shall issue against the same," and no judgment against the Board shall be a lien upon its property or that of the State held pursuant to the act. Laws 1935, c. 121, s 5.

This exemption from process to enforce liability is expressed clearly and forcibly. Any process to enforce an order for abatement or alteration of a dam is proscribed as a form of like process to seizure. It would be a form of process in interference with the State's property, and a strange and ill-considered purpose to permit it while the property itself may not be subject to levy is not to be ascribed to the legislature. Such process would amount to a remedial measure the use of which is denied. Indirection through orders on the Board or its directors should not accomplish what is forbidden by direct means. The legislative intent to grant an exception to the rule that it is impossible for the State, in the exercise of its sovereignty, to maintain an unlawful nuisance, when strict private rights are not invaded, is not apparent. The evident methods of satisfying a judgment against the Board are limited to voluntary action on its part and to application of the rules of set-off and allied subjects.

In conclusion, in adoption of the principle that legislation in the public interest and of the character of that here considered should be construed to permit its purposes to be achieved without checks and restraints not ordained in express terms or by clear implication, the view is taken that the plaintiff's claims may be satisfied only by such relief as the legislature may validly grant.

*Bill dismissed.*

All concurred.