Request of the House of Representatives
No. 94-322

OPINION OF THE JUSTICES
(Public Use of Coastal Beaches)

October 27, 1994

The following request for an opinion of the justices was adopted by the House on May 5, 1994, and filed with the supreme court on May 6, 1994:

"Whereas, there is pending in the House, SB 636, 'An act relative to the public use of coastal beaches for recreational purposes;' and

"Whereas, an amendment has been proposed to SB 636 (document #6087B); and

"Whereas, SB 636, as amended, recognizes that New Hampshire holds in public trust all shorelands subject to the ebb and flow of the tide; and

"Whereas, based on testimony presented to the house Committee on Resources, Recreation and Development, SB 636, as amended, acknowledges that for an extended period of time exceeding 20 years the public has made recognized, prevalent, and uninterrupted use of the vast majority of New Hampshire's coastal beaches, including the high ground generally known as the 'dry sand' area; and

"Whereas, SB 636, as amended, recognized that this 'dry sand area' may lie shoreward of the public trust shoreland; and

"Whereas, SB 636, as amended, would recognize and confirm a public easement in the coastal beaches where the public has traditionally had access; and

"Whereas, SB 636, as amended, would establish that when a dispute exists over the public's access rights to land in any defined coastal beach area, a presumption arises that a public easement exists on that disputed land; and

"Whereas, questions have arisen as to the constitutionality of certain provisions of the bill; and

"Whereas, it is important that the questions of constitutionality of said provisions should be settled in advance of its enactment; now therefore be it

"Resolved by the House of Representatives:

"That the Justices of the Supreme Court be respectfully requested to give their opinion on the following questions of law:

1. Whether New Hampshire law identifies a particular coastal feature or tidal event as outlining the maximum shoreward extension of the public trust area boundary as defined in SB 636,

as amended, beyond which the probable existence of private property rights may, without a public easement arising from historical practice, restrict any public access under the provisions of Part I, Article 12 of the New Hampshire Constitution and the 5th amendment of the United States Constitution?

2. Whether the effect of SB 636, as amended, which recognizes that the public trust extends to those lands 'subject to the ebb and flow of the tide' infringes upon existing private property rights as protected by Part I, Article 12 of the New Hampshire Constitution and the 5th Amendment of the United States Constitution?

3. Whether the provisions of SB 636, as amended, which recognize a public easement in the 'dry sand area' of historically accessible coastal beaches is a taking of private property for a public purpose without just compensation in violation of Part I, Article 12 of the New Hampshire Constitution and the 5th amendment of the United States Constitution?

4. Whether those provisions of SB 636, as amended, which are based on the finding that the public has made recognized, prevalent, and continuous use of the New Hampshire coastal beaches, and which require any property owners claiming an exception to this finding to bear the burden of proving such exception, deprive such owners of property rights without due process of law in violation of the 14th amendment of the United States Constitution?

"That the clerk of the house of representatives transmit a copy of this resolution along with a copy of SB 636 and the amendment to SB 636 to the Justices of the New Hampshire Supreme Court."

The following response is respectfully returned:

*To the Honorable House:*
The undersigned justices of the supreme court submit the following reply to your questions of May 5, 1994. Following our receipt of your resolution, we invited interested parties to file memoranda with the court on or before September 1, 1994.

SB 636 (the bill), as amended, proposes to amend RSA chapter 483-B (1992) by inserting after section 9 a new section, 483-B:9-a, titled "Public Use of Coastal Beaches." The legislature's purpose is set out in the bill as follows:

It is the purpose of the general court in this section to recognize and confirm the historical practice and common law right of the public to enjoy the existing public

easement in the greatest portion of New Hampshire coastal beach land subject to those littoral rights recognized at common law. This easement presently existing over the greater portion of that beachfront property extending from where the 'public trust' ends across the commonly used portion of sand and rocks to the intersection of the beach and the high ground, often but not always delineated by a sea wall, or the line of vegetation, or the seaward face of the foredunes, this being that beach where violent sea action occurs at irregular frequent intervals making its use for the usual private constructions uneco[n]o[m]ical and physically impractical.

The bill defines "coastal beaches" as "that portion of the beach extending from where the public trust shoreland ends, across the commonly used portion of sand and rocks to the intersection of the beach and high ground, often but not always delineated by a seawall, or the line of vegetation, or the seaward face of the foredunes."

The bill states that "New Hampshire holds in 'public trust' rights in all shorelands subject to the ebb and flow of the tide and subject to those littoral rights recognized at common law" and that the " 'public trust' shoreland establishes the extreme seaward boundary extension of all private property rights in New Hampshire except for those 'jus privatum' rights validly conveyed by legislative act without impairment of New Hampshire's 'jus publicum' interests." The bill then provides that

for an historical period extending back well over 20 years the public has made recognized, prevalent and uninterrupted use of the vast majority of New Hampshire's coastal beaches above the 'public trust' shoreland. The legislature recognizes that some public use of the beach area above the public trust lands is necessary to the full enjoyment of the land. The general court recognizes and confirms a public easement flowing from and demonstrated by this historical practice in the coastal beaches contiguous to the public trust shoreland where the public has traditionally had access and which easement has been created by virtue of such uninterrupted public use.

Further, the bill states that "[a]ny person may use the coastal beaches of New Hampshire where such a public easement exists

for recreational purposes subject to the provisions of municipal ordinances," but "[t]he provisions of [the bill] shall in no way be construed as affecting the title of property owners of land contiguous to land subject to a public easement." Finally, the new section provides that "[i]n a suit brought or defended under this section, or whose determination is affected by this section, a showing that the area in dispute is within the area defined as 'coastal beach' shall be prima facie evidence that a public easement exists."

Your first question asks "[w]hether New Hampshire law identifies a particular coastal feature or tidal event as outlining the maximum shoreward extension of the public trust area boundary . . . beyond which the probable existence of private property rights may, without a public easement arising from historical practice, restrict any public access under the provisions of Part I, Article 12 of the New Hampshire Constitution and the 5th amendment of the United States Constitution." We answer in the affirmative.

■ Part I, article 12 of the New Hampshire Constitution provides that "no part of a man's property shall be taken from him, or applied to public uses, without his own consent, or that of the representative body of the people." This clause requires just compensation in the event of a taking. *Piscataqua Bridge v. N.H. Bridge,* 7 N.H. 35, 66–70 (1834). "The same principle was embodied in the Fifth Amendment to the Constitution of the United States at the insistence of a majority of the States, including New Hampshire, in ratifying the Constitution." *Burrows v. City of Keene,* 121 N.H. 590, 596, 432 A.2d 15, 18 (1981). The fifth amendment of the Federal Constitution provides that "no person shall . . . be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

The public trust has its origins in the concept of the *jus publicum,* an English common law doctrine under which the tidelands and navigable waters were held by the king in trust for the general public. *See* Sax, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention,* 68 MICH. L. REV. 471, 475–76 (1970). The English common law was based, in turn, upon the ancient Roman concept of "natural law" that held that certain things, including the shores, by their nature are common to all. *See* Comment, *The Public Trust Doctrine in Maine's Submerged Lands: Public Rights, State Obligation and the Role of the Courts,* 37 ME. L. REV. 105, 107–08 (1985). At common law, the king had

"both the title and the dominion of the sea, and of rivers and arms of the sea, where the tide ebbs and flows, and all of the lands below high-water mark, within the jurisdiction of the crown of England." *Shively v. Bowlby,* 152 U.S. 1, 11 (1894). The king held the title to intertidal lands, or *jus privatum,* absolutely, and in his role as sovereign he held the public rights, or *jus publicum,* in trust for the benefit of the public. *Id.* Although the king could convey the lands below the high water mark, any conveyance to a private individual was subject to the *jus publicum. Id.* at 13. The *jus publicum* included uses "for highways of navigation and commerce, domestic and foreign, and for the purpose of fishing by all the King's subjects." *Id.*

Following the American Revolution, "the people of each state became themselves sovereign; and in that character hold the absolute right to all their navigable waters and the soils under them for their own common use, subject only to the rights since surrendered by the Constitution to the general government." *Martin v. Waddell,* 41 U.S. (16 Pet.) 367, 410 (1842). Upon entering the union, the original thirteen States and all new States acquired title to lands under waters subject to the ebb and flow of the tide. *Phillips Petroleum Co. v. Mississippi,* 484 U.S. 469, 476 (1988). As sovereigns, the States hold the intertidal lands in trust for the public and "have the authority to define the limits of the lands held in public trust and to recognize private rights in such lands as they see fit." *Id.* at 475.

In 1889, this court rejected a Massachusetts law that adopted the low water mark as the boundary between public and private ownership. *Concord Co. v. Robertson,* 66 N.H. 1, 26–27, 25 A. 718, 730–31 (1889). The Massachusetts rule, embodied in a 1647 ordinance, extended private titles "to encompass land as far as mean low water line or 100 rods from the mean high water line, whichever was the lesser measure." *In re Opinion of the Justices,* 313 N.E.2d 561, 565 (Mass. 1974). The purpose of the ordinance was "to encourage littoral owners to build wharves." *Id.*

The *Robertson* court rejected the need to vest New Hampshire private property owners with fee title to the tidelands below high water mark:

> While the [Massachusetts] ordinance maintains the public title of large ponds, it converts into private property, and gives away, a great amount of tide-land. . . . In this state, the transfer of the fee to the abutters has not been necessary to encourage improvements below high-water mark. Their common-law

right of reasonable use has been sufficient for all the purposes for which the [Massachusetts] ordinance changed the common-law title. . . . Private ownership of so much of the tide-land (not exceeding 100 rods in width) as is bare twice a day, and public ownership where vessels can come to a wharf at low tide, is not an adequate or useful adjustment of rights for commercial purposes. Where tide-land ought to be improved and occupied by the abutter, above and below low-water mark, he has a common-law right to improve and occupy it.

66 N.H. at 26, 25 A. at 730. The court noted that "no serious inconvenience has arisen from the adoption of the water's edge as the boundary of public and private ownership." *Id.* at 20, 25 A. at 727. "The experience of more than 250 years has shown no practical difficulty in the question of the abutters' reasonable private use, and no defect in the law calling for such amendments as have been made in Massachusetts in relation to tide-waters." *Id.* Regarding ownership of the shore, the court concluded that "[t]he introduction of any line other than high-water mark as the marine boundary would overturn common-law rights that had been established here, by a usage and traditional understanding of two hundred years' duration." *Id.* at 27, 25 A. at 730–31.

█ *Robertson* still represents the law in New Hampshire. While it is settled, therefore, that the public trust in tidewaters in this State extends landward to the high water mark, the following common law questions are not settled: what is the high water mark; where is it located; and how is it located. We do not purport to determine in this opinion answers to such questions.

Your second question asks "[w]hether the effect of [the bill], which recognizes that the public trust extends to those lands 'subject to ebb and flow of the tide' infringes upon existing private property rights as protected by Part I, Article 12 of the New Hampshire Constitution and the 5th amendment of the United States Constitution." We answer in the negative.

█ As already set out in our answer to your first question, New Hampshire has long recognized that lands subject to the ebb and flow of the tide are held in public trust. "Land covered by public water is capable of many uses." *Concord Co. v. Robertson,* 66 N.H. at 7, 25 A. at 721. "Rights of navigation and fishery are not the whole estate" but rather the public trust lands are held "for the use and benefit of all the [public], for all useful purposes . . . ." *Id.* at 7–8, 25 A. at 721 (quotation omitted); *see St. Regis Co. v. Board,*

92 N.H. 164, 170, 26 A.2d 832, 837–38 (1942) (public trust encompasses "all useful and lawful purposes"); *State v. Sunapee Dam Co.,* 70 N.H. 458, 463, 50 A. 108, 110 (1900) ("in this state the law of public waters is what justice and reason require"). These uses include recreational uses. *See Hartford v. Gilmanton,* 101 N.H. 424, 425–26, 146 A.2d 851, 853 (1958) (public waters may be used to boat, bathe, fish, fowl, skate, and cut ice).

■ In addition, we have uniformly held that owners of property adjacent to lands held in public trust have common law rights which are "more extensive than those of the public generally." *Sundell v. Town of New London,* 119 N.H. 839, 844, 409 A.2d 1315, 1317 (1979) (quotation omitted).

> These rights, recognized at common law, constituted property which could not be taken without compensation . . . . These private rights of littoral owners include but are not necessarily limited to the right to use and occupy the waters adjacent to their shore for a variety of recreational purposes, the right to erect boat houses and to wharf out into the water. We have also held that these private littoral rights are incidental property rights which are severable from the shore property itself and may be conveyed separate from the littoral property.
>
> . . . Because these littoral rights are an incident of ownership of shore property, their value is reflected in the fact that shorefront property commonly is substantially more valuable than property otherwise situated.

*Id.* at 844, 409 A.2d at 1318 (citations omitted). "The rights of littoral owners on public waters are," however,

> always subject to the paramount right of the State to control them reasonably in the interests of navigation, fishing and other public purposes. In other words, the rights of these owners are burdened with a servitude in favor of the State which comes into operation when the State properly exercises its power to control, regulate, and utilize such waters.

*Sibson v. State,* 110 N.H. 8, 10, 259 A.2d 397, 400 (1969). Private shorefront owners are entitled to exercise their property rights in the tidelands so long as they do not unreasonably interfere with the rights of the public. *See Concord Co. v. Robertson,* 66 N.H. at 20, 25 A. at 727.

■ Therefore, to the extent that the term "lands subject to ebb and flow of the tide" applies to tidelands below the high water mark, the bill simply codifies the common law and does not infringe upon private property rights. Where private title to tidelands is already burdened by preexisting public rights, a regulation designed to protect those same rights will not constitute a taking of property without just compensation.

■ Your third question asks "[w]hether the provisions of [the bill], which recognize a public easement in the 'dry sand area' of historically accessible coastal beaches is a taking of private property for a public purpose without just compensation in violation of Part I, Article 12 of the New Hampshire Constitution and the 5th amendment of the United States Constitution." Except for those areas where there is an established and acknowledged public easement and subject to the assumptions contained in the discussion below, we answer in the affirmative.

The bill apparently recognizes two property interests in two distinct areas of shoreland. First, the bill establishes that "New Hampshire holds in 'public trust' rights in all shorelands subject to the ebb and flow of the tide." Second, the bill establishes a public easement in land "extending from where the public trust ends across the commonly used portion of sand and rocks to the intersection of the beach and the high ground, often but not always delineated by a sea wall, or the line of vegetation, or the seaward face of the foredunes." This high ground is generally known as the "dry sand" area. The bill states that

> for an historical period extending back well over 20 years the public has made recognized, prevalent and uninterrupted use of the vast majority of New Hampshire's coastal beaches above the 'public trust' shoreland. . . . The general court recognizes and confirms a public easement flowing from and demonstrated by this historical practice in the coastal beaches contiguous to the public trust shoreland where the public has traditionally had access and which easement has been created by virtue of such uninterrupted public use.

As noted in our answer to your first question, this court has not defined the term "high water mark." Because, however, the bill states that the dry sand area is not within the public trust we will, for purposes of this opinion, base our analysis on that assumption. We construe the bill, therefore, as recognizing public trust rights below the dry sand area and a prescriptive easement in the dry

sand. *See Waterville Estates Assoc. v. Town of Campton,* 122 N.H. 506, 508, 446 A.2d 1167, 1168 (1982) ("easement is a nonpossessory interest in realty which can only be created by prescription, written conveyance or implication").

▉▉▉▉ "To establish a prescriptive easement, the plaintiff must prove by a balance of probabilities twenty years' adverse, continuous, uninterrupted use of the land [claimed] in such a manner as to give notice to the record owner that an adverse claim was being made to it." *Mastin v. Prescott,* 122 N.H. 353, 356, 444 A.2d 556, 558 (1982) (quotation omitted). Although the general public is capable of acquiring an easement by prescription, *Elmer v. Rodgers,* 106 N.H. 512, 515, 214 A.2d 750, 752 (1965),

> [e]vidence of continuous and uninterrupted public use of the premises for the statutory period . . . is insufficient alone to establish prescriptive title as a matter of law. The nature of the use must be such as to show the owner knew or ought to have known that the right was being exercised, not in reliance upon his toleration or permission, but without regard to his consent.

*Vigeant v. Donel Realty Trust,* 130 N.H. 406, 408, 540 A.2d 1243, 1244 (1988) (ellipses in original) (quotation omitted). While the fact that the owner was also using the premises for the same purposes would not prevent a finding of adverse use by the general public, *Elmer v. Rodgers,* 106 N.H. at 515, 214 A.2d at 752, "[a] permissive use no matter how long or how often exercised cannot ripen into an easement by prescription." *Ucietowski v. Novak,* 102 N.H. 140, 145, 152 A.2d 614, 618 (1959). The general public may, therefore, acquire coastal beach land by prescription in New Hampshire.

▉▉▉ ▉▉▉ Problems militate, however, against the use of the prescriptive doctrine. "First, there is the obvious problem of establishing factual evidence of the specialized type of adverse use for the requisite period of time . . . needed to create an easement by prescription." 3 R. POWELL, POWELL ON REAL PROPERTY § 34.11[6], at 34-171 (1994). "Secondly, prescriptive easements, by their nature, can be utilized only on a tract-by-tract basis, and thus cannot be applied to all beaches within a state." *Id.* In a suit to quiet title, adequate evidence may well exist to prove that on a given piece of property, the area landward of the public trust across the dry sand is subject to a public easement. Such a determination is, however, a judicial one.

It is the constitutional mandate that questions of law belong to the judiciary for final determination, as a necessary deduction of the required separation of the legislative, executive and judicial powers of government. (Const., Part I, *Art.* 37). It follows that legislation cannot bar or restrict this power of the judiciary, and the courts have inherent power, through appropriate process, to act upon and decide such questions, if they are not of a strictly political nature.

*Cloutier v. State Milk Control Board,* 92 N.H. 199, 201–02, 28 A.2d 554, 556 (1942).

■■■ Although the bill does not completely deprive private property owners of use of their property, "[t]he interference with private property here involves a wholesale denial of an owner's right to exclude the public." *Bell v. Town of Wells,* 557 A.2d 168, 178 (Me. 1989) (quotation omitted). "If a possessory interest in real property has any meaning at all it must include the general right to exclude others." *Id.*

"Property," in the constitutional sense, is not the physical thing itself but is rather the group of rights which the owner of the thing has with respect to it. The term refers to a person's right to possess, use, enjoy and dispose of a thing and is not limited to the thing itself. The property owner's right of indefinite user (or of using indefinitely) . . . necessarily includes the right . . . to exclude others from using the property, whether it be land or anything else. From the very nature of these rights of user and of exclusion, it is evident that they cannot be materially abridged without, *ipso facto,* taking the owner's property. The principle must be the same whether the owner is wholly deprived of the use of his land, or only partially deprived of it.

*Burrows v. City of Keene,* 121 N.H. at 597, 432 A.2d at 19 (ellipses in original) (citations and quotations omitted); *see Claridge v. N.H. Wetlands Bd.,* 125 N.H. 745, 749–50, 485 A.2d 287, 291 (1984).

■■■ When the government unilaterally authorizes a permanent, public easement across private lands, this constitutes a taking requiring just compensation. *See Nollan v. California Coastal Comm'n,* 483 U.S. 825, 831 (1987). In *Nollan* the United States Supreme Court stated:

[A]s to property reserved by its owner for private use, the right to exclude [others is] one of the most essential sticks in the bundle of rights that are commonly characterized as property . . . . [O]ur cases uniformly have found a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner. We think a permanent physical occupation has occurred, for purposes of that rule, where individuals are given a permanent and continuous right to pass to and fro, so that the real property may continuously be traversed, even though no particular individual is permitted to station himself permanently upon the premises.

*Id.* at 831–32 (quotations and citations omitted); *see Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 426–27 & n.5 (1982).

 Because the bill provides no compensation for the landowners whose property may be burdened by the general recreational easement established for public use, it violates the prohibition contained in our State and Federal Constitutions against the taking of private property for public use without just compensation. Although the State has the power to permit a comprehensive beach access and use program by using its eminent domain power and compensating private property owners, it may not take property rights without compensation through legislative decree. *See Eaton v. B.C. & M.R.R.,* 51 N.H. 504, 510–11 (1872). "[A] strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Appeal of Public Serv. Co. of N.H.,* 122 N.H. 1062, 1071, 454 A.2d 435, 440 (1982) (citation and quotation omitted); *see Eaton,* 51 N.H. at 518 ("if the work is one of great public benefit, the public can afford to pay for it") (quotation omitted).

Based on our response to your third question, we deem it unnecessary to answer your fourth question.

 We emphasize that this opinion does not amount to a judicial decision. An opinion of the justices on proposed legislation is not binding upon the court in the event the proposed legislation

should become law and a case should arise requiring its construction. *Opinion of the Justices,* 25 N.H. 537, 538 (1852).

DAVID A. BROCK
WILLIAM F. BATCHELDER
WILLIAM R. JOHNSON
W. STEPHEN THAYER, III
SHERMAN D. HORTON

October 27, 1994

*Jeffrey R. Howard,* attorney general (*Anne E. Renner,* assistant attorney general, on the memorandum), filed a memorandum in support of negative answers to questions one and two.

*Thomas J. Kirby,* of Pelham, filed a memorandum on behalf of twenty-three members of the New Hampshire House of Representatives, in support of an affirmative answer to question one and negative answers to questions two, three, and four.

*McLane, Graf, Raulerson & Middleton P.A.,* of Concord (*Gregory H. Smith & a.* on the memorandum), filed a memorandum on behalf of the New Hampshire Senate, in support of an affirmative answer to question one and negative answers to questions two, three, and four.

*Senator Burton J. Cohen,* of New Castle, filed a memorandum in support of negative answers to the questions presented.

*Upton, Sanders & Smith,* of Concord (*Frederic K. Upton* on the memorandum), filed a memorandum on behalf of affected beachfront property owners in support of affirmative answers to the questions presented.

*Michael L. Donovan,* of Concord, filed a memorandum on behalf of the Town of Rye in support of negative answers to the questions presented.

*Noucas & Keenan P.A.,* of Portsmouth (*Christopher W. Keenan* on the memorandum), filed a memorandum on behalf of the Concerned Citizens of the Seacoast, in support of negative answers to the questions presented.

*Devine, Millimet & Branch P.A.,* of Manchester (*Thomas Quarles, Jr.* and *Richard W. Head,* on the memorandum), filed a memorandum on behalf of the Audubon Society of New Hampshire, the New Hampshire Wildlife Federation, and the Appalachian Mountain Club, in support of an affirmative answer to question one and negative answers to questions two, three, and four.

*Dr. Chris D. Kehas,* of Rye Beach, filed a memorandum in support of an affirmative answer to question one and negative answers to questions two, three, and four.

*Stephen J. Little, Mary Gladys Little,* and *Richard D. Little,* of Portsmouth, filed a memorandum in support of affirmative answers to the questions presented.

*Byron M. Philbrick,* of Rye, filed a memorandum in support of affirmative answers to the questions presented.

*Eugene Ritzo,* of Rye, filed a memorandum in support of affirmative answers to the questions presented.